UNITED STATES *v.* BEADENKOPF CO. (No. 1840). UNITED STATES *v.* PROCTOR CO. (No. 1841). UNITED STATES. *v.* STONE, TIMLOW & CO. (INC.) (No. 1842).[1]

1. CONSTRUCTION, PARAGRAPH 305, TARIFF ACT OF 1913—"OTHER LIKE ANIMALS."
     The expression "Other like animals," in paragraph 305, tariff act of 1913, has reference to resemblance in the growth on the skins and not in the other physical characteristics of the animals.—Crimmins & Pierce et al. *v.* United States (6 Ct. Cust. Appls., 137; T. D. 35392), and Bloomingdale Bros. *v.* United States (8 Ct. Cust. Appls., 104; T. D. 37221).
2. CONSTRUCTION, PARAGRAPH 305, TARIFF ACT OF 1913—"ANGORA"—CAPE ANGORA.
     A more or less degenerate goat, known as the "Cape Angora," produced by breeding the original Angora with the Cape Colony goat, whose hair is shown to be dealt in, used, and known as mohair, is an "Angora goat" within the meaning of that expression in paragraph 305, tariff act of 1913.
3. CONSTRUCTION, TARIFF ACT OF 1913—LEGISLATIVE HISTORY AND CONTEXT AS GUIDE—MOHAIR—ANGORA GOATSKINS WITH HAIR ON.
     The language of preceding tariff acts considered in comparison with that of the act of 1913, the hearings before the congressional committee which propounded the act of 1913 and the context of the act, conduce to the conclusion that it was the congressional purpose to distinguish for the first time in many years between hair of the Angora goat and other like animals on the one hand and the wool or hair of the sheep or other like animals on the other, for the purpose of levying duty upon mohair and manufactures of it. In view of this radical change in the statute, the earlier decisions and administrative practice admitting free of duty Angora goatskins with the hair on are not controlling.
4. EVIDENCE—PRESUMPTION IN FAVOR OF COLLECTOR'S CLASSIFICATION.
     The assessment by the collector of duty upon merchandise as Angora goat hair puts upon the appellant from that assessment the burden of showing that it is not Angora goat hair.
5. CAPE ANGORA GOATSKINS WITH HAIR ON.
     Cape Angora goatskins with the hair on, imported for leather use, the hair to be removed and sold for use as mohair, are not admissible free as entireties under paragraphs 603, 604, or 650, tariff act of 1913. The hair is dutiable under paragraph 305, "hair of the Angora goat, alpaca, and other like animals, and all hair on the skin of such animals * * * ."

---

[1] T. D. 37539 (34 Treas. Dec., 166).

United States Court of Customs Appeals, February, 8, 1918.

APPEAL from Board of United States General Appraisers, Abstract 40714.

[Reversed.]

*Bert Hanson*, Assistant Attorney General (*Frank P. Wilson*, special attorney, of counsel), for the United States.

*Comstock & Washburn* (*Albert H. Washburn* and *J. Stuart Tompkins* of counsel) for appellees.

[Oral argument Dec. 6, 1917, by Mr. Wilson and Mr. Tompkins.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

In G. A. 7878 (T. D. 36271), In re the protests of Wm. Beadenkopf Co. against an assessment by the collector of customs at the port of Philadelphia the Board of General Appraisers rendered an opinion relating to the hair on certain skins therein referred to as "Cape Angora goatskins."

No duty had been taken on the skins, but the growth thereon had been assessed at the rate of 15 per cent ad valorem under paragraph 305 of the tariff act of 1913.

In substance the board held that said paragraph 305, which reads "hair of the Angora goat, alpaca, and other like animals, and all hair on the skin of such animals, 15 per centum ad valorem," was not applicable to the hair on the skins in that case. It appeared to the satisfaction of the board that while the hair showed traces of Angora goat hair, it was not in fact such within the paragraph; that it could not be used for any of the purposes for which such hair was ordinarily used; that the skins were imported not for the growth upon them but to use the pelts in making leather; and that whatever part the hair thereon played in the business of the importers, it was incidental to the leather use of the skins. The protests claiming free entry under paragraphs 603, 604, or 650 of the act, were sustained. No appeal was taken by the Government.

Prior to the act of 1913 Angora goat hair, imported separately from the skins upon which it grew, had been classified under the provision for wool in schedule K, while such skins with the hair on had generally been given free entry under other statutes then in force, and the board in view of the facts found by it was of opinion that Congress had not intended by the act of 1913 to change the long-continued custom of allowing free entry to such skins with hair on.

We understand that Wm. Beadenkopf Co., appellee here, was the importer in the above case. This may be hereinafter referred to as the "first Beadenkopf case."

The protests now under consideration cover several entries and involve assessments made in Boston, New York, and Philadelphia.

Those made in the name of W. N. Proctor 'Co. are really on behalf of Stone, Timlow & Co. (Inc.), the former being customs brokers for the latter. There were various hearings by the board at the three places of importation and such proceedings had that the record in the first Beadenkopf case was incorporated in the record of one or more of the other cases, all were consolidated in one record, determined by the board in one opinion and come here as one appeal.

In the cases before us the Board of General Appraisers, adhering to its view expressed in the first Beadenkopf case, sustained all the protests. Among other things, after quoting from its opinion in the first Beadenkopf case, it said:

It can not be said from the combined record now before us, as in the case cited, that the witnesses are agreed that the growth on the skins in question, "while it may show traces of Angora goat hair, is not in fact such hair and can not be used for any of the purposes for which such hair is ordinarily used," for the Government has succeeded in producing proof, which, if standing alone uncontradicted or unexplained, might lead to the conclusion that the growth on the skins in question when removed might be used for some of the purposes for which the true Angora hair is used. There is one point, however, upon which all the witnesses in the case at bar are agreed, namely, that the skins in issue are of the Cape Angora goat, and that the animals from which such skins came were crosses between the Asiatic Angora goat and the Cape Colony common goat. Effort was made by the Government to establish by the testimony of some of the witnesses that there was a marked difference in the growth upon the skins covered by the Beadenkopf protests and those covered by the Stone, Timlow & Co. protests, and that the growth on the latter was much superior and of greater value than the other. Whether or not it may be said that the Government succeeded in establishing that the growth on the skins of Stone, Timlow & Co. was superior to that on the skins of Beadenkopf & Co. we do not think material, since it is quite clear that it is not established that the hair on any of the skins covered by the protests is the hair of the Angora goat.

\* \* \* \* \* \* \*

As we pointed out in G. A. 7878, supra, the practice had been long continued of admitting such skins as these to free entry and we do not believe it was the intention of Congress in framing paragraph 305 to include the skins of degenerate Cape Angora goats.

It would seem from this quoted part of the board's opinion that inasmuch as the skins bearing the hair in issue were those of the Cape Angora goat and not the Asiatic, and as such goats were crosses between the Asiatic Angora goat and the common goat of Cape Colony, it was the board's conclusion that the hair would not fall under paragraph 305, notwithstanding it appeared that such hair might be used for some of the purposes for which true angora goat hair was employed.

We are not able to give unqualified assent to this proposition.

The importers here claim, as they did in the first Beadenkopf case, that these skins as entireties are entitled to free entry under paragraphs 603, 604, or 650 of the act of 1913.

A review of preceding tariff acts, especially in connection with the hearings before the committee having charge of the preparation of the

present act considered in the light of what is known upon the subject of the Angora goat industry in this country, demonstrates that in the act of 1913 Congress undertook for the first time in many years to distinguish between hair of the Angora goat and other like animals on the one hand and the wool or hair of the sheep or other like animals on the other. The same intent as to the manufactures of the two products is equally apparent, for in addition to the provisions of paragraph 305, it provided in those immediately following for various named manufactures of the hair of the Angora goat, alpaca, and other like animals, and in paragraph 308 for "all manufactures of every description made by any process" wholly or in chief value of such hair.

A like intent is manifested, and indeed emphasized, by the change made in paragraph 395 of the act of 1909 as reenacted in paragraph 304 of the act of 1913. In the former it was declared that the word "wool" when used in connection with manufactured articles should include the "wool or hair of the sheep, camel, goat, alpaca, or other animal," while in the latter the provision is for "wool or hair of the sheep, camel, or other like animals."

The view that the provision for hair of other like animals in paragraph 305 refers to the growth on their skins rather than to their physical characteristics has already been adopted by this court. Crimmins & Pierce et al. v. United States (6 Ct. Cust. Appls., 137; T. D. 35392); Bloomingdale Bros. v. United States (8 Ct. Cust. Appls., 104; T. D. 37221).

In view of the radical change in the statute, we do not think the earlier decisions granting, or administrative practice allowing, free entry to Angora goatskins with the hair on are controlling.

Any question, however, as to the proper classification of such skins with hair on used for fur purposes, if any such are imported, is not here involved, considered, or decided.

We first consider whether the skins covered by the protests here are Angora goatskins, or the skins of like animals under paragraph 305. They come from Cape Colony, Africa, and are generally known as Cape Angora goatskins. The goats producing them are known as Cape Angora goats, sometimes called crossbred Angoras, and are the descendants, more or less removed, of the Asiatic Angora goat, whose original habitat is the vilayet of Angora in Turkey, crossed upon a Cape Colony common goat—some of the witnesses testified a sheep. How many goat generations ago the cross was made, what the subsequent breeding has been, or the degree of Asiatic Angora blood in the goats producing these skins does not appear. The common, as well as the commercial name for all Angora goat hair is mohair. This is of many grades or qualities. We think the evidence here establishes that the hair assessed for duty in the cases before us is

dealt in and known as mohair, and shows a strain of Angora blood. It is also established that the hair on some of these skins is of a much better quality than that on others, and that all is inferior to the best grade of Turkish mohair, which, owing to the European war, is now rarely if ever imported.

It clearly appears from the proceedings before the Ways and Means Committee, charged with preparing the tariff bill of 1913, that a protective duty was asked on behalf of the Angora goat raisers in this country and also on behalf of the manufacturers of mohair here against the raw mohair and the manufactured products thereof whether the same came from Asia or Cape Colony. It was definitely represented that unless such protection was granted, the Angora goat industry in this country could not continue and that if it were destroyed the result would be, in view of the consequent diminished world production of, and the great world demand for, mohair, an increased price of the raw material in this country, even though such material was given free entry. It was specifically recommended that to secure the desired protection the statute should provide for a duty on "all hair of the Angora goat, alpaca, and other like animals." Specific and detailed reasons were presented to the committee in support of this claim, although protection of the kind sought was conceded by the movers to be contrary to the underlying principle of the proposed act. During the hearing it was suggested by a member of the committee that if mohair be separated from wool for tariff purposes that policy must be followed all the way down the line in the finished products, and one gentleman representing the Angora goat industry declared that was what ought to be done. (See hearings before Committee on Ways and Means, 1913, Vol. IV, Schedule K, etc., pages 4287–4304.)

We are impressed with the view that, because these skins are either of crossbred, or, as the board also characterizes them, of degenerate Angora goats, the board was of opinion that the hair thereon was not hair of the Angora goat within paragraph 305, and importers, among other things, strongly urge this contention. In view of the record here we can hardly agree with such a conclusion. A degenerate Angora goat is probably, as was defined by one of the witnesses, one that is not bred properly, is run out, which we understand simply means a poor specimen of the Angora goat. Such an individual undoubtedly produces a poor quality of Angora hair. Common experience in animal raising, however, justifies the statement that any given strain or breed may degenerate in individual cases, but that does not preclude the animal from being classified as of the given breed. Likewise a crossbreeding may or may not, according to the circumstances and especially what is undertaken to be accomplished by such crossbreeding, produce an animal very

similar to or very different from the original breed. Any high-grade animal not pure bred is the product of some crossbreeding; but that fact is not inconsistent with and does not preclude the animal being commonly regarded for some purposes as in the class of the purer stock.

The growth on these skins has been assessed as Angora goat hair, which implies that the skins are those of the Angora goat, as that term is commonly understood. It is necessary for the importers to show otherwise. No witnesses possessing expert or considerable knowledge on the subject of Angora goat raising have been produced. Such evidence as has been given on the subject came from those whose knowledge was the result of examinations of or familiarity with goatskins or goat hair, or both, which they had imported or dealt in, and it was their opinion that as compared with such samples of the Asiatic Angora as they had seen, the hair on the skins before us was greatly inferior thereto. But it clearly appears that there are many grades of the Asiatic product, and there is but little, if any, evidence which tends to show that the hair before us is greatly inferior to some of those grades.

Counsel for both parties refer to the testimony given before the Ways and Means Committee before mentioned and to a publication issued by the Department of Agriculture under date of November 28, 1908, entitled "The Angora Goat" and known as "Farmers' Bulletin No. 137."

Accepting for the purposes of this case as counsel seem to accept, this bulletin, as an authority, and considering the testimony before the Ways and Means Committee together with the record evidence so far as the latter throws any light thereon, we conclude it is extremely difficult to say just what is now an Angora goat. Originally, it seems to have been a native of the vilayet of Angora, already referred to. It was valuable chiefly because of its hair which was from 8 to 12 inches in length, white, curly, or rather in ringlets, silky and lustrous. The goats were shorn annually. The desirable characteristics of the hair, are, it is said in the bulletin, claimed to be the result of peculiar conditions, climatic or otherwise, existing in the vilayet of Angora, but it is also therein stated that it has been found that much depends upon other conditions, such as feed and care. The beginning of the Angora goat industry in Cape Colony was the importation of Angora goats from Turkey and crossing them upon the common goat. In this country the Angora goat industry began with the importation of goats from Turkey supplemented later on by importations from both Turkey and Cape Colony. After a time the export of Angora goats from both these places was prohibited. In the bulletin it is stated that the crossbreeding of pure Angora goats with common goats was many years ago extensively resorted to in

Turkey for the purpose of increasing the gross quantity of mohair there and the same practice has obtained in Cape Colony. The result of all this crossbreeding renders it doubtful if in either place there are many pure Angoras at the present time. In other words, the so-called Angora goats of Turkey and Cape Colony, and the same is true of this country, are crossbreeds, more or less removed from the original true Angora type, whatever that may have been.

The finding of the board that these skins are a product of crossbred Angoras, in view of the evidence upon which the finding was based, indicates but little as to the degree of Angora blood in the goats themselves, because no one undertook to say how near those crossbreeds approached the standard of pure Angoras, if such standard there be. As before stated, the testimony shows and the exhibits indicate that the hair is of various grades and lengths. While the hair of the so-called true Angora, as already appears, if shorn but once a year, is from 8 to 12 inches long, it also appears that in the warmer climates it is necessary to shear the goats twice a year, which reduces the length of the semiannual crop to about one-half that of the annual growth. Of course, the length of the hair on the skins before us depends largely upon the time when the pelts were taken, with reference to the last shearing, and the quality depends somewhat upon the age and probably much upon the condition of the animal at that time. As we understand the testimony, the length of the hair on the imported skins is sufficient to meet the requirements of Angora hair, and the conceded fact that it is made into yarns for carpets demonstrates that so far as length is concerned it may be made into fabrics. A mohair carpet would certainly seem to be within the provisions of paragraph 308. In the main, the hair involved in these cases is lustrous and in many, if not every instance, is more or less curly. Witnesses on behalf of the Government testified that yarns could be and were produced from like hair suitable for use in making any of the fabrics or manufactures made from Angora goat hair. The evidence, we think, sustains and requires the conclusion that the hair on these skins is dealt in as mohair and the skins themselves known as Cape Angora skins or Cape Angora goatskins. The commercial acceptance of the word "Angora" as a part of the description of the goats, and of mohair as descriptive of the hair thereon, is suggestive. Congress was aiming at protection against the products of the Cape Angora goats as well as those of Asia, and the grade of the product was not made a criterion.

If, however, with more accurate knowledge of the subject it should transpire that these skins are not those of the Angora goat, within the contemplation of the statute, we fail to see how on this record it could be held that the hair is not that of "like animals" under

paragraph 305.   That paragraph does not contemplate that the hair must be identical with that of either the Angora goat or the alpaca but only such a degree of similarity as makes it commercially and practically susceptible to like uses and capable of coming into competition with Angora goat hair, nor do we think the uses must extend to all those to which the true Angora hair may be applied.

We do not lose sight of the fact that some of the skins involved in the first Beadenkopf case are brown in color and if all or a major part of these importations were skins of that character, such fact might make against the collector's classification. It appears, however, that the hair on some of the skins covered by the first Beadenkopf case was passed free of duty as not being the hair of the Angora goat. The examiner who passed these skins testified in that case that the samples before the board included some skins which were free. So far as we are advised by the record, they may have been the skins carrying dark colored hair. No such skins seem to be among the importations in these cases. That the skins are imported by the leather industry is not important. After importation the hair is removed and made into yarns for manufacture. It therefore competes with like hair raised on Angora goats in this country.

In this connection it may be of interest to note that in a later publication of the Department of Agriculture, Farmers'. Bulletin, 573, on the subject of "The Angora Goat," issued in 1914, it is said that though almost always pure white in this country, occasionally the color of the goat is black, perhaps caused by a cropping out of impure strains of blood, and that "California mohair often has a characteristic reddish cast." It is also said that "the Angora, as brought from Turkey, was considered too small for American purposes and was largely crossed upon the common goat."

We think upon the record the board erred in holding that the skins, the hair upon which was assessed for duty, were not the skins of Angora goats within the contemplation of paragraph 305 and are therefore of opinion that the judgment of the Board of General Appraisers ought to be, and it is, *reversed*.