(C. D. 1779)

UNITED TRADING CORPORATION *v.* UNITED STATES

United States Customs Court, Third Division

(Decided May 10, 1956)

*Lawrence & Tuttle (Walter I. Carpeneti, Charles F. Lawrence,* and *George R. Tuttle* of counsel) for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Richard H. Welsh, John J. Antus, William J. Vitale, Mollie Strum,* and *Samuel D. Spector,* trial attorneys), for the defendant.

Before EKWALL and JOHNSON, Judges

EKWALL, Judge: These cases, which have been consolidated, involve importations of canned vegetables imported from Mexico, which are claimed by the plaintiff to be properly dutiable under the provision in paragraph 775 of the Tariff Act of 1930, in effect at the time of entry, for "pimientos, packed in brine or in oil, or prepared or preserved in any manner, 6 cents per pound." The collector of customs at the port of entry assessed duty thereon at 35 per centum ad valorem under the provision in the same paragraph for "Vegetables * * * pickled, or packed in salt, brine, oil, or prepared or preserved in any other way and not specially provided for," under a ruling of the Commissioner of Customs published as T. D. 51050. The pleadings also contain a claim that the weight of the brine or other packing material should not be included in the dutiable weight. This claim was not referred to in plaintiff's brief and presumably is waived.

In support of its claim that the merchandise is pimientos, plaintiff introduced into evidence the chemists' reports of their analyses of the merchandise, which reports are in the following language:

The sample consists of cooked capsicum, a pepper of the pungent type.

The reports also state the net and drained weights of the contents of the tins, together with the percentage of salt in the aqueous drained

liquid. Plaintiff also produced the testimony of one Evelyn Lee Chang, the widow of the president and owner of the United Trading Corporation, and of Arthur J. Fritz, a customs broker.

Mrs. Chang stated that she had accompanied her husband on his trips to Mexico and was acquainted with his business; that the plaintiff corporation secured all of the merchandise described as pimientos from the Industrial Ensenada, a plant that packs them in Mexico; that she is familiar with the manner in which the merchandise was described on the tins. She had been in Ensenada and had seen the merchandise grown and also saw it packed in the factory; she also saw it after its arrival in this country. At first, the merchandise was described on the labels as pimientos but, later on, plaintiff was required to relabel and reclassify it as "Pimiento-Chili, Cross or Hybrid."

This witness further testified that she used the commodity in her home as garnishes or decorations for salads and also chopped it up to mix with sandwich spreads, but never used it in any hot dishes of any kind. Prior to the time that her husband commenced importing this merchandise from Mexico, she had used similar merchandise, which she bought in the stores, in the same way as she subsequently used the imported. The goods thus purchased and used were packed under different labels but were described as pimientos.

On cross-examination, the witness stated that her husband imported but one brand, The Flying V; that the plaintiff had an exclusive contract with the packer and was the sole purchaser of this brand. She was under the impression that plaintiff bought all of the pimiento crop from this shipper and packer; so far as she knew, the merchandise was packed in brine. So far as she could describe the process, she testified that the fresh vegetable was "cooked to a certain temperature, and then cooled, and then cooked again in brine and put in cans and covered, and then cooked again, and then labelled."

The second witness for the plaintiff was a customhouse broker who made entry of the merchandise here involved and had been making entry for identical merchandise since 1923, when plaintiff started importing it. He testified that the subject of correct labeling of the tins was taken up with the Commissioner of Customs after discussion with Mr. Chang and also with the Department of Agriculture and, as a result, a ruling was handed down by the Commissioner, which ruling he discussed also with Mr. Chang. As he recalled, the first shipment was classified as pimientos, the second and subsequent shipments as pimientos, cross or hybrid. As to the importations made subsequent to 30 days after the ruling, the merchandise was classified as prepared vegetables.

Defendant introduced the testimony of a United States Government chemist who, during the period covering these importations,

was a chemist with the Food & Drug Administration. His duties consisted of examining and analyzing all food and drug merchandise that was imported at the port of San Francisco. He identified the tins which had been introduced into evidence as illustrative of the merchandise in suit and also identified the label which had been removed from one of the tins in suit, which label was received in evidence as exhibit C. The witness testified concerning a series of tests he had made of the merchandise here in suit as to the weight and the character of the contents of the tins. His description of the product was as follows:

* * * it contained considerable salt present in drained liquor—only a very small amount of drained liquid was present. The product was of good quality, consisting of whole fruit, that is no pieces were noted. Product does not appear to be true pimientos in that they are distinctly hot in flavor. Product consists of red peppers in good condition, * * *.

In arriving at the nature of the imported product, he collected two samples of what he considered to be true pimientos in tins, which he obtained in the local market. In comparing these with the imported product, he found them to be very mild in taste, as compared with the hot taste of the imported. In describing the imported product, he stated that it was rather dark red in color and was so hot that unless one was used to eating such products it could not be left in the mouth for any length of time. In answer to interrogations by the court, this witness stated that pimientos, as known in this country, are sweet and very mild in taste, whereas the product under consideration is very hot in taste and is not a true pimiento.

Mr. Andrew J. Brown also testified on behalf of the defendant. His testimony may be summarized as follows: At the time of these importations, he was chief of the San Francisco office of the United States Food & Drug Administration, which position he retained until 1949, when he asked to be relieved of some of his duties. He remained as assistant until June 1951, at which time he retired. He served the Food & Drug Administration from 1919 until the date of his retirement, starting as inspector and advancing to chief inspector and then chief of station. He recalled the fact of these importations and that he had some conversation with the customs broker in regard to them. He stated the substance of such conversations to be that these importations of so-called pimientos could be sold to the armed services under the original labels, providing the armed services were notified as to the true character of the merchandise; otherwise, goods not sold to the armed services would have to be relabeled as a pimiento-chili hybrid or cross. So far as his knowledge went, all future shipments were required to bear the label showing it to be a hybrid, specifically specifying it to be a pimiento-chili hybrid.

Plaintiff contends that, even assuming this merchandise is a hybrid pimiento-chili, it is entitled to classification as pimientos under the well-known rule that an *eo nomine* designation of an article, without limitations or a shown contrary legislative intent, and without proof of commercial designation, will include all forms of said article. *Nootka Packing Co. et al.* v. *United States*, 22 C. C. P. A. (Customs) 464, T. D. 47464. Plaintiff contends that, under this rule, hybrids or crossbreeds are included within the pimientos provided for in paragraph 775, *supra*, and cites in support of his contention the case of *United States* v. *Beadenkopf Co.*, 8 Ct. Cust. Appls. 283, T. D. 37539. That case involved the dutiable classification of the hair of the "Cape Angora" goat, produced by breeding the original angora with the Cape Colony goat. The provision of the statute there under consideration was paragraph 305 of the Tariff Act of 1913, which provided for "hair of the Angora goat, alpaca, and other like animals, * * *." The court of appeals held that the "Cape Angora" hair properly fell within the purview of said paragraph 305 and made use of the following language:

* * * The evidence, we think, sustains and requires the conclusion that the hair on these skins is dealt in as mohair and the skins themselves known as Cape Angora skins or Cape Angora goatskins. The commercial acceptance of the word "Angora" as a part of the description of the goats, and of mohair as descriptive of the hair thereon, is suggestive. Congress was aiming at protection against the products of the Cape Angora goats as well as those of Asia, and the grade of the product was not made a criterion.

If, however, with more accurate knowledge of the subject it should transpire that these skins are not those of the Angora goat, within the contemplation of the statute, we fail to see how on this record it could be held that the hair is not that of "like animals" under paragraph 305. That paragraph does not contemplate that the hair must be identical with that of either the Angora goat or the alpaca but only such a degree of similarity as makes it commercially and practically susceptible to like uses and capable of coming into competition with Angora goat hair, nor do we think the uses must extend to all those to which the true Angora hair may be applied.

In view of the wording of the paragraph there involved, which provided for hair of "other like animals," that case is distinguishable from the case now before the court, in that the statutory provision here involved, paragraph 775, *supra*, contains no provision for merchandise similar to pimientos.

The evidence before us on behalf of the plaintiff, consisting of the statements of Mrs. Chang as to the use she made of this merchandise in her own home, is outweighed by that of the defendant's witnesses, the first of whom had had extensive experience with the United States Food & Drug Administration in examining and analyzing all food and drug merchandise imported at the port of San Francisco. His description of the instant merchandise was that it consisted of red peppers. He had compared it with what he considered to be true

pimientos, which he obtained in a local market, and stated that, whereas the pimientos known in this country are sweet and very mild in taste, the imported product under consideration is very hot to the taste and is not a true pimiento. The second witness for the defendant testified as to the requirement of the Food & Drug Administration, with which branch of the Government he had been connected for a number of years, that the product represented by the merchandise here involved should be relabeled to show that it is a hybrid, specifically, pimiento-chili hybrid.

The collector, by his action in classifying this product under the general term vegetables, prepared, rather than under the *eo nomine* provision for pimientos, both of which terms appear in said paragraph 775, presumably has found all the conditions to exist in order to support that classification. The burden was on the importer to show that either the imported commodity was not a vegetable or, if a vegetable, that it is a pimiento. That burden has not been met. We, therefore, overrule plaintiff's claim. In view of that holding, it is unnecessary to pass upon or discuss the question of the dutiable weight of the imported product.

Judgment will be rendered for the defendant.