SEWARD v. UNITED STATES (No. 1910).[1]

1. EVIDENCE—CONFLICTING TESTIMONY—PRESUMPTION IN FAVOR OF BOARD.
    With the testimony in conflict, the Board of General Appraisers' finding of fact should control.

2. EVIDENCE, MATERIALITY.
    For the purpose of construing paragraph 348, tariff act of 1913, with reference to kid-skin crosses, it is not material that goatskin crosses might have to some extent been imported if it is shown that they are not commonly imported in that form.

3. CONSTRUCTION, PARAGRAPH 348, TARIFF ACT 1913—KID SKINS—" GOATSKINS."
    With proof that kid skins and goatskins are different things commercially, the provisions for goatskin articles in paragraph 348, tariff act of 1913, will be held not to include kid-skin articles.

4. CONSTRUCTION, PARAGRAPH 348, TARIFF ACT OF 1913—PLATES—CROSSES.
    With proof that " crosses " and " plates," as applied to articles made of fur skins, have distinct meanings and are not interchangeable, a cross can not be dutiable as a plate under paragraph 348, tariff act of 1913.

---

[1] T. D. 37842 (35 Treas. Dec., 246).

5. KID-SKIN CROSSES.

    Crosses made of dressed kid skins sewed together are dutiable under paragraph 348, tariff act of 1913, not as "plates and mats of * * * goatskins," but as "manufactures of fur * * *, when prepared for use as material, joined or sewed together * * *."

## United States Court of Customs Appeals, November 26, 1918.

APPEAL from Board of United States General Appraisers, G. A. 8157 (T. D. 37603).

[Affirmed.]

*Ely Neumann* for appellant.

*Bert Hanson,* Assistant Attorney General (*Frank P. Wilson* and *Charles D. Lawrence,* special attorneys, of counsel), for the United States.

    [Oral argument Oct. 31, 1918, by Mr. Neumann and Mr. Lawrence.]

    Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

The importation involved in this case consists of dressed China kid skins sewed into the form of crosses. They were classified by the collector as a manufacture of fur dutiable at 40 per cent under paragraph 348 of the act of 1913.

The majority of the board found the facts upon which they predicated their decision as follows: (1) That there is a well-settled and generally recognized commercial distinction between goatskins and kid skins; (2) that goatksins are not imported sewed into the form of crosses; (3) that "crosses" and "plates" as applied to articles made of fur skins have distinct meanings and are not interchangeable.

As the construction to be placed upon this statute will in our judgment depend to a considerable extent upon the question of whether these findings are supported by the testimony, we will first consider that question, the findings being challenged by the importer.

Dealing first with the question of whether there is a commercial distinction between goatskins and kid skins. The importer called as his first witness Harold J. Stephens. He was asked on direct examination, after identifying samples:

Q. Please state what *species* of animal those skins came from.—A. The goatskins.

On cross-examination he was asked:

Q. Do any differences exist between kid skins and goatskins?—A. Difference in value, difference in size.

Q. Aren't those skins before you, Exhibits 1 and 2, commonly designated as kid skins?—A. Yes; they are generally known as kid skins.

Q. And they are so invoiced in this case, aren't they?—A. Yes.

Q. Don't you import goatskins?—A. Yes.

Q. So designated?—A. Yes, sir.

Q. If you had an invoice enumerating goatskins and kid skins you would expect to find two different commercial articles, wouldn't you?—A. Yes, sir.

The next witness called was J. H. Bleistein. He was asked, on direct examination:

Q. Will you please look at Exhibits 1 and 2 and state what in your opinion they are?—A. They are kid-skin crosses.

Q. From what animal?—A. Kid-skin crosses from a young goat.

On cross-examination he was asked:

Q. And there is a class of skins well recognized in your trade as goatskins, aren't there?—A. Yes, sir.

Q. How do they differ from the merchandise represented by Exhibits 1 and 2?—A. Well, these first are crosses; that means skins sewn together; and goatskins are skins, individual skins of the larger size, heavier leather and longer hair.

\*        \*        \*        \*        \*        \*        \*

Q. But you say it is not customary with goatskins to sew them into this form?—A. No.

Q. They are imported as separate skins?—A. Skins or so-called plates or rugs.

Q. What is the commercial goatskin commonly used for?—A. You mean the dressed goatskin?

Q. Yes.—A. Fur sets and fur robes; some fur coats.

Q. What is the mechandise represented by the Exhibits 1 and 2 commonly used for?—A. Also for fur sets, sets, mostly ladies' fur coats, because they are lighter in weight.

\*        \*        \*        \*        \*        \*        \*

Q. Let me ask you if the distinction between kid skins and goatskins has been recognized during your entire commercial experience?—A. I have a different idea when I get an offer of a kid skin, I think of something else again when I get an offer of a goatskin, but it is the same animal at a different stage of life.

Again:

Q. If you had an offer from a customer in the trade who knew his business, if you had an offer from such a man of goatskins, you would not think it contemplated kid skins?—A. Oh, no.

Q. On the contrary, if he wanted to sell some kid skins you would not expect to get goatskins?—A. No.

A different line of examination was pursued with the next witness, Millard J. Manheims. He was asked, on direct examination:

Q. Will you please examine Exhibits 1 and 2 in this case?—A. Yes, sir.

Q. Will you now state what animal those skins came from?—A. Goats.

The witness was then handed over to the Government, and on cross-examination he was asked:

Q. You mean that it is of goat origin, don't you?—A. No; from goats.

Q. (Last question repeated by the stenographer).—A. Young goat.

Q. Commonly and commercially known as kid?—A. Yes.

Q. How long have you as a dealer handled skins or merchandise of the character of Exhibits 1 and 2?—A. I guess for the last 36 or 40 years.

Q. During that period have they always been designated as kid skins?—A. Yes, sir.

Q. By the way, these exhibits are made up, aren't they, of a number of skins?—A. Yes, sir.

Q. And are recognized in this condition as kid-skin crosses?—A. That is the trade name for them.

Q. Do you deal in skins or mats made from goatskins?—A. Mats, yes.

Q. Made of goatskins?—A. Yes; mats and skins.

Q. Do you distinguish in the trade between goatskins and kid skins?—A. As a matter of price; sometimes a goatskin has just as short hair as these kids, but commonly called goats.

Q. I want to know if a customer came to you to buy goatskins, you would know that he did not mean kid skins?—A. Yes; sir.

Q. If he came to buy kid skins you would not show him goatskins?—A. If he asked for kid crosses.

Q. If he asked for kid crosses you would know exactly what he meant?—A. Yes.

Q. Are goatskins made into crosses?—A. Sometimes they are.

Q. Or is that only the kid?—A. If you have a short-hair goat it is made into crosses.

Q. But it is a common thing to make kid into crosses?—A. Yes.

The next witness called was John V. A. Cattus. He was asked to examine the exhibits, and was asked what animals they came from, and he replied, "Exhibit 1 is a gray kid-skin cross, Chinese."

Q. What animal?—A. Kid.

Q. A kid. What animal do you mean by that?—A. The kid is the young goat.

Q. Now, Exhibit 2?—A. Is a natural black kid cross.

Q. The same with reference to the animal, goat?—A. The same.

On cross-examination he was asked:

Q. And Exhibits 1 and 2 represent, do they, what you in the trade recognize as kid-skin crosses?—A. They do.

Q. What the trade you come in contact with knows as kid-skin crosses, aren't they?—A. Yes.

Q. Do you deal in fur material known as goatskins?—A. Yes.

Q. That is recognized as distinct and apart from kid skin, isn't it, as a merchantable article?—A. I do not understand the question.

Q. Do you in the trade distinguish between the goatskins and kid skins?—A. Well, I don't know whether the question ever came up, whether they distinguish the difference. There is a difference, but whether they distinguish it or not I don't know.

Q. Do you deal in that which you recognize commercially as goatskins?—A. I do.

Q. In what form, just the skin individually?—A. A goatskin is a skin.

Q. Do you deal in goatskins made up into articles of any kind, like mats and plates?—A. Yes, sir; goatskin mats.

Q. And they are known distinctly as goatskin mats or plates, are they?—A. Rugs and mats.

Q. The word goatskin is used, is it, goatskin mats or rugs?—A. Goatskin mats, goatskin rugs.

Q. Goatskin plates?—A. Goatskin plates.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Kid-skin crosses are as the name implies, in the form of a cross?—A. They have four wings.

The next witness called was Harry Lang. He was asked to examine the exhibits and to tell what animal the skins came from.

A. They are called kid-skin crosses, but they are kid goats.

Q. What does the trade understand by kid goats?—A. They are goatskins.

It will be noted that the question put by the importer's counsel did not call for the commercial designation of this article, but its derivation.

On cross-examination he was asked:

Q. Do you buy or sell merchandise like Exhibits 1 and 2?—A. I have bought and sold lots of them.

Q. And they are commonly recognized in your trade as kid-skin crosses?—A. Yes, sir.

Q. Whenever a dealer speaks of kid-skin crosses, you know precisely what he wants?—A. What he wants.

Q. Do you deal in an article or skin or material which is definitely known in the trade as goatskins?—A. Yes, sir.

Q. In what form is the skin?—A. Well, they—we dye them for selling purposes.

Q. Do you handle goatskins as single skins?—A. Yes, sir.

Q. Also goatskin mats?—A. Mats, rugs, plates.

Q. Plates?—A. We have handled plates.

Q. Goatskin mats, plates, rugs, are recognized as a different commercial article from kid-skin crosses, aren't they?—A. They are longer in hair, but I have handled some of these that had just as long hair as the goat.

Q. No. I mean in commercial transactions you distinguish?—A. Yes, this is what we would call kid skins and the other we would call goatskin or goatskin rug.

The next witness called was Francis Veere Lauder. He was asked:

Q. Now, if shown the exhibits in this case, could you tell from an inspection of them what animal they came from?—A. Yes, sir.

Q. Will you please examine Exhibits 1 and 2?—A. A young goat.

Q. Chinese goat?—A. Chinese goat.

It will be noted that again the importer's counsel asked for the derivation of the article and not its commercial designation.

On cross-examination the witness further testified that he had seen merchandise called crosses made of goatskins, and, asked if they were imported into this country, said:

A. Yes, sir; they have been imported into this country.

Q. Within your personal knowledge?—A. Yes, sir.

\*       \*       \*       \*       \*       \*       \*

Q. How long since?—A. Sometime about the year 1905.

\*       \*       \*       \*       \*       \*       \*

Q. Have they ever been imported since that time?—A. Not to my knowledge. The demand for that kind of an article fell away to be used for imitation of Tibet.

Q. It is a common thing, however, to import kid-skin crosses, isn't it?—A. Kid or young goat, yes.

Q. Kid or young goat?—A. What we call it.

Q. It is true, is it not, that they are always referred to as kid-skin crosses?—A. Not always. It is a trade——

He was here interrupted by the question—

Q. I mean, having reference to the wholesale trade dealing in skins, don't they commonly refer to these as kid-skin crosses?—A. Not always. Very frequently known as plates.

He was further asked:

Q. Do you deal in any goatskins?—A. Yes, sir.

Q. You recognize in the trade a distinction between kid-skin crosses and goatskin mats or whatever they may be?—A. Simply as a convenience.

This testimony as to commercial designation was further emphasized by witnesses called by the Government. The witness Jaulus testified to long familiarity with this provision, and when asked, "Will you please state whether or not the trade that you are familiar with has made a distinction commercially between kid skins and goatskins?" replied, "Decidedly so. The nature of the skins, of the product, will bring it so."

Q. Has that distinction always existed in the trade so far as your experience relates?—A. Yes, sir.

Q. Are you familiar with the uses of kid crosses?—A. Yes, sir.

And in answer to the question, "Would a delivery of goatskins be accepted by the ordinary tradesman on an order for kid crosses?" replied, "It would not."

Q. Would you ever think of delivering kid crosses on an order for goatskins?—A. I would not attempt to do it.

Q. As a matter of fact, is it common in your trade experience to have goatskins in the form of crosses?—A. No, sir.

Numerous other witnesses were called, further sustaining the claim that there is a commercial distinction between kid-skin crosses and goatskin crosses. In determining the question of commercial designation, the derivation of the article as from an animal which in one sense may be a goat, or the definition of a kid as a young goat, is of very little value indeed. There is an undoubted distinction between cowhide leather and calfskin. The calf may be a young cow. The real question is whether the article, in the form in which it appears as imported, has a distinct commercial designation differing from the commercial designation which is given to an article which might fall under a different classification, or whether it has a commercial designation which brings it within the terms of the paragraph under which it is assessed. We think that the testimony not only supports the finding of the board but that it is, when analyzed, practically uncontradicted on the record.

As to the second finding that the goatskins are not imported sewed into the form of crosses, there might be more room for question as to the finding. There is testimony by an importer's witness already quoted to the effect that up to 1905 goatskin crosses were

imported, but that he has not known of any having been imported since that time. Other witnesses testified that goatskins are not imported in the form of crosses and the board so found. It would be sufficient to say that there is a conflict of testimony upon this question, and that the board's finding should control. But more than this, for the purpose of construing this statute, we think that it is not material that goatskin crosses might have to some extent been imported if they are not commonly imported in that form.

The third finding that " crosses " and " plates " as applied to articles made of fur skins have distinct meanings and are not interchangeable is supported by just as strong weight of the testimony as the commercial designation.

We come, then, to an examination of the statute. The paragraph reads as follows:

348. Furs dressed on the skin, not advanced further than dyeing, 30 per centum ad valorem; plates and mats of dog and goat skins, 10 per centum ad valorem; manufactures of furs, further advanced than dressing and dyeing, when prepared for use as material, joined or sewed together, including·plates, linings, and crosses, except plates and mats of dog and goat skins * * * 40 per centum ad valorem.

That this importation is dutiable as " manufacturers of furs * * * prepared for use as material joined or sewed together " as crosses is obvious, and that they are therefore dutiable under paragraph 348 at 40 per cent ad valorem, unless they fall within provisions of that paragraph which make an exception to the affirmative clause, is equally obvious. Now, what have we to mark the exception? Keeping in mind the established fact that there is a well-recognized commercial distinction between kid skins and goatskins and between kid-skin crosses and plates and mats of dog and goat skins, we find that there are no exceptions or modifications of the provisions of this act which lift out kid-skin crosses from the affirmative provisions, for plates and mats of dog and goat skins have their application and do not include kid skins. They are given a special rate in the early part of the paragraph and in the latter part are excepted from the provision which fixes a 40 per cent rate, and it is significant that while the provision for manufactures is by express terms made to include furs joined together as material, including plates, linings, and *crosses*, the exception noted is restricted to *plates* and *mats* and also restricted to those of dog and goat skins. If the dog and goat skin is commercially different from the kid skin, there are two points of distinction: One is that crosses are not excepted, and the other that the material of which these crosses is composed is not, commercially speaking, the *goatskin*, but something quite different.

Counsel refer to and rely upon the decision of the board in G. A. 7569 (T. D. 34493) as making for a different conclusion. What that

case holds in effect is that goatskins are not dutiable under the first provision of paragraph 348 for furs dressed on the skin, not advanced further than dyeing. The logic of the opinion is that the Congress, by paragraph 348, sought to withdraw dog and goat skins from the general provision for furs dressed on the skin or introduced in the form of plates, mats, or crosses, and for that reason held goatskins dutiable by similitude as goatskin plates and mats which they most resemble. The board was dealing with a provision which in its terms of exception covered certain products of the merchandise there under consideration, namely, dog and goat skins. In this case, under the finding of facts, fully supported by the testimony, the board dealt with no such thing, nor is this court dealing with any such merchandise. For *commercially* speaking, this importation is an article entirely distinct from goatskins or goatskin plates or mats, for two reasons, first, that kid skins are distinguishable commercially from goatskins, and, secondly, fur crosses are distinguishable from mats and plates.

The decision of the Board of General Appraisers is *affirmed*.