DRAEGER SHIPPING CO. ET AL. *v.* UNITED STATES (No. 2529) [1]

1. COMMERCIAL DESIGNATION NOT PRESUMED TO CONTINUE—KIDSKINS AND GOATSKINS, CROSSES AND PLATES, PARAGRAPH 1420, TARIFF ACT OF 1922.

There is no presumption that a commercial designation, once established, continues; but it is a fact to be proved in each case. The decision of this court in *Seward* v. *United States*, 9 Ct. Cust. Appls. 4, that, commercially, kidskins were not goatskins and crosses were not plates, is no authority for the decision to the same effect by the Board of United States General Appraisers in this case, under paragraph 1420, Tariff Act of 1922. See *Wanamaker* v. *United States*, 13 Ct. Cust. Appls. 93, T. D. 40939.

2. REHEARING—DISCRETION.

The decision of the Board of United States General Appraisers proceeded upon a conclusion of law so obviously wrong that it was without its discretion to deny a rehearing; and both the judgment and the order denying the rehearing are reversed and the case remanded.

United States Court of Customs Appeals, January 18, 1926

APPEAL from Board of United States General Appraisers, Abstract 47946

[Reversed and remanded.]

*Allan R. Brown* for appellants.
*William W. Hoppin*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.

---

[1] T. D. 41341.

[Oral argument October 7, 1925, by Mr. Brown and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Paragraph 1420 of the Tariff Act of 1922 reads as follows:

Furs dressed on the skin, excepting silver or black fox furs, not advanced further than dyeing, 25 per centum ad valorem; *plates and mats of dog and goat skins, 10 per centum ad valorem;* manufactures of furs, excepting silver or black fox, further advanced than dressing and dyeing, prepared for use as material, joined, or sewed together, *including plates, linings, and crosses, except plates and mats of dog and goat skins,* and articles manufactured from fur, not specially provided for, 40 per centum ad valorem; silver or black fox skins, dressed or undressed, and manufactures thereof, not specially provided for, 50 per centum ad valorem; articles of wearing apparel of every description partly or wholly manufactured, composed wholly or in chief value of *hides or skins of cattle of the bovine species,* or of dog or goat skins, and not specially provided for, 15 per centum ad valorem; articles of wearing apparel of every description wholly or in part manufactured, composed wholly or in chief value of fur, not specially provided for, 50 per centum ad valorem.  (Italics ours.)

The importations involved in this case consist of kid skin crosses which were assessed as manufactures of fur at 40 per centum ad valorem under paragraph 1420, *supra.*   The protests of Draeger Shipping Co. and N. Sobel (Inc.) were consolidated into one case.   The importers protested the assessment and claimed the goods to be dutiable at 25 per centum, 10 per centum, or 15 per centum, respectively, under paragraph 1420, or at 20 per centum under paragraph 1459.   The answer to the protest by the appraiser, which appears in the record, states that "the merchandise consists of kid skins with the fur on, further advanced than dressing and dyeing and sewed into crosses."   The importations consisted of several entries, and the merchandise in the entries was described as "dressed black kid crosses," "kid crosses," "gray kid crosses," "dressed kid crosses," and "kid skin crosses."

At the hearing before the Board of General Appraisers, two witnesses testified.   Meyer Sobel, who belonged to the firm of N. Sobel (Inc.), one of the protestants, qualified as being a dealer in all kinds of fur, both as a buyer and manufacturer, covering a period of a number of years.   He stated that he was familiar with and handled plates, mats, crosses, and robes, and that, "according to the usage of terms in the United States," the samples he had before him, which were evidently in the form of crosses, "are plates or crosses, as you like," and that either "plates" or "crosses" would correctly describe the article; that the article is used for making coats, and for making trimmings, such as collars and cuffs on ladies' cloth coats; that a plate or a cross, "as we know it *here* is made in the form of a cross;" that mats are made into oblong shapes similar to robes;

that there is no distinction between the two except as to size, the robes being the larger.     The testimony of this witness is somewhat confusing as to whether the major portion of the importations was made of skins of mature goats or of skins of kids.     It is conceded that the importations consisted of crosses made from a number of skins sewn together.

The second witness, William J. Hare, was called by the Government.     He stated that he was an examiner at the appraiser's stores at the port of New York, had served in that capacity for about 14 years as an examiner of furs, and examined the importations in controversy.     It is evident that he was testifying from his experience as an examiner, but made no attempt to qualify as a trade witness. He stated that a mat made of goatskin or dogskin would be one skin with sufficient pieces sewn to the edges to make it oblong, and would be about 42 inches by 28 inches in size; that a plate of dog or of goat skin would have six or more skins in it and would be almost square, some of them being more or less oblong; that a fur cross is a number of skins sewn together in the shape of a maltese cross, its wings being about 50 inches in width; that the importations consist of the kid-skin crosses; that collective Exhibit 1, furnished by the importers is composed of coarser hair than the crosses in the importations; that he never saw crosses from China in any other shipment as coarse as the sample furnished; that kid-skin crosses are made up of small pieces of fur; that he never passed crosses from China as kid-skin plates at 10 per centum, but that all of them are returned at 40 per centum; that he never saw any goat crosses, becauses they do not make them into crosses—they make them into plates or robes; that goatskins from China are passed at 10 per centum; robes are passed at 10 per centum, as plates or mats by similitude; that rugs of goatskins are also passed at 10 per centum by similitude; that there are plates imported from Russia which contain as high as 150 skins and other plates which would not have more than 6 or 8; that the samples are in the shape of a maltese cross.

In *Seward* v. *United States*, 9 Ct. Cust. Appls. 4, this court held, under the proof in that case, that there was a distinction *commercially* between goatskins and kid skins, and between crosses made of fur, and mats and plates made of fur.

It is apparent, from the testimony of the importers' witness, that no attempt, in this case, was made to prove that there was or was not a distinction between kidskins and goatskins.     The importers relied upon the recent decision of this court in *Wanamaker* v. *United States*, 13 Ct. Cust. Appls. 93, T. D. 40939, which held that, in the absence of commercial proof, the kidskin jackets under consideration were more specifically described as wearing apparel composed of goatskins than as manufactures of fur.     Importers, by their inter-

ested trade witness, attempted to prove that the commercial meaning of crosses was identical with the commercial meaning of plates. The Government's witness, while not qualifying as a trade witness, gave testimony squarely in conflict with the importers' witness. His testimony, under the rules applicable to commercial meaning, while clear and quite convincing, goes only to the common meaning of the terms and to administrative practice.

If the importers in this case have, by the meager statement of facts by their single interested witness, proved that, in trade and commerce in the United States on the date of the passage of the Tariff Act of 1922, fur crosses and fur plates were synonymous terms and meant the same thing and that this trade understanding on that date was definite, uniform, and general and not partial, local, or personal, then it seems to us that the phrase "except plates and mats of dog and goat skins" would include the importations at hand and take them out of the 40 per centum phrase and place them in the class covered by "plates and mats of dog and goat skins, 10 per centum ad valorem."

If we were to consider the record as it stands, it would be necessary for us to determine whether or not the importers have established commercial designation in the manner indicated, or, to be more precise, in a proper case, it would be necessary for us to determine whether or not the board had correctly decided this question in accordance with the weight of the evidence. We would be much handicapped, however, in passing upon this question, since it is apparent that the board gave it no consideration and did not weigh the importers' evidence; and, in this respect, we would not be reviewing the action of the board. Were it necessary for us to pass upon the weight of this evidence, we would have some hesitancy in doing so before the board had done so. This court being a court of appeals does not weigh the evidence nor consider it as does a *nisi prius* court, but we review the action on such evidence by the lower court under certain well-settled rules.

The opinion of the board is as follows:

The merchandise which is the subject of these protests was returned at the rate of 40 per centum ad valorem under paragraph 1420, Tariff Act of 1922, as manufactures of fur. Protestants claim that duty should have been assessed at either 10 per centum, 15 per centum, or 25 per centum under the said paragraph, or at 20 per centum under paragraph 1459 of said act.

The testimony of the examiner who passed the merchandise and returned it with an advisory classification which was followed by the collector, is that he was unable to remember any long-haired skins similar to those produced as samples, in the importations in question, and that he had never seen in his experience as examiner plates or crosses made from goatskins.

So far as the provision for plates and mats of dog and goat skins in paragraph 1420, supra, is concerned it is precisely the same as that found in paragraph 348 of the tariff act of 1913. That there is a recognized commercial distinction between kidskins and goatskins seems to be well settled. In determining a similar

issue raised under paragraph 348 of the act of 1913 we made the following findings of fact in our decision G. A. 8157 (T. D. 37603):

We regard the following facts as established by the weight of evidence: (1) That there is a well settled and generally recognized commercial distinction between goatskins and kidskins; (2) that goatskins are not imported sewed into the form of crosses; (3) that "crosses" and "plates" as applied to articles made of fur skins have distinct meanings and are not interchangeable.

That case was appealed to the Court of Customs Appeals and our findings of fact, as stated above, were approved by the court.   See *Seward* v. *United States,* 9 Ct. Cust. Appls. 4; T. D. 37842.   The law in so far as this issue is concerned has not been changed, and we think we are justified in assuming that the commercial distinction between kid and goatskins has not changed in the meantime.

The protests are overruled and the decisions of the collector affirmed in each case.

It is apparent from the decision that the court below again held, as it held in the Wanamaker case, *supra,* that the commercial meaning established in the Seward case, *supra,* was binding upon it in this case and established the fact that there was a commercial distinction between kidskins and goatskins.   This is clearly contrary to the views expressed by this court in the Wanamaker case, *supra,* wherein is found the following:

But the Government further argues that when the commercial meaning of a tariff term describing merchandise has once been ascertained in a given case, it should be presumed to continue and be applied, without proof thereof, to subsequent importations of the same kind of merchandise even under statutes subsequently enacted.

We can not agree with this view of the law.   The settled rule is that, while tariff acts are generally to be construed according to the commercial understanding of the terms employed, such terms will be presumed to have the same meaning in commerce as in ordinary use unless the contrary be shown.   *Swan* v. *Arthur,* 103 U. S. 597; *Bloomingdale Bros.* v. *United States,* 3 Ct. Cust. Appls. 204, T. D. 32530; *Acker* v. *United States,* 1 Ct. Cust. Appls. 328, T. D. 31431.

There is no proof of commercial designation in this case.

The rule that, by the reenactment in the same language of a prior statute, a former judicial interpretation thereof is thereby approved, can apply so far only as the common meaning is concerned.   It can not apply to commercial meaning, because that must always be established, like any other fact, by competent evidence introduced in the case in which such meaning is in issue.   *Straus & Co.* v. *United States,* 7 Ct. Cust. Appls. 414, T. D. 36982; *United States* v. *Sheldon & Co.,* 5 Ct. Cust. Appls. 371, T. D. 34555; *United States* v. *Jackson,* 1 Ct. Cust. Appls. 25, T. D. 30849; *United States* v. *Oberle,* 11 Ct. Cust. Appls 527, T. D. 31545.

The soundness of this view is manifest when we consider that the commercial designation which may be proven must be that which is in existence prior to *and at the date* of the passage of the act, at which time it must be definite, uniform, and general and not partial, local, or personal.   *Maddock* v. *Magone,* 352 U. S. 368.

If the Government's contention be upheld, it follows that importers, as well as American manufacturers, wholesalers, and producers, may be precluded from proving or denying a commercial meaning the existence or nonexistence of which may determine their rights and concerning which they may never have been given a day in court.

The importers made application for rehearing before the Board of General Appraisers and pointed out clearly the error into which the board had fallen as above indicated.

The board entered a three-line order denying the rehearing. This action on the part of the board has been properly assigned as error, by the importers, in this case. Under such circumstances it was error for the court below to deny the petition for rehearing. Its decision proceeded upon a conclusion of law so obviously wrong that it was not within its discretion to deny the petition.

The judgment of the board, in this case, and the order denying rehearing, are reversed and the case is remanded to the Board of General Appraisers with instructions to grant a rehearing as prayed for.

*Reversed* and *remanded.*