SUNDE & D'EVERS CO. ET AL. *v.* UNITED STATES (No. 3054)[1]

United States Court of Customs and Patent Appeals, April 2, 1929·

*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) for appellants.
*Charles D. Lawrence*, Assistant Attorney General (*Fred J. Carter*, special attorney, of counsel), for the United States.
*William W. Hoppin, amicus curiae.*

[Oral argument December 12, 1928, by Mr. Baldwin, Mr. Carter, and Mr. Hoppin]

Before GRAHAM, Presiding Judge, and BLAND and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from the United States Customs Court.

The merchandise involved consists of "hemp halibut lines" used for fishing purposes. It was assessed for duty by the collector at the port of Seattle, Wash., as cords of hemp at 23½ cents per pound under paragraph 1004 of the Tariff Act of 1922, which reads as follows:

PAR. 1004. Single yarns, in the gray, made of flax, hemp, or ramie, or a mixture of any of them, not finer than twelve lea, 10 cents per pound; finer than twelve lea and not finer than sixty lea, 10 cents per pound and one-half of 1 cent per pound additional for each lea or part of a lea in excess of twelve; finer than sixty lea, 35 cents per pound; and in addition thereto, on any of the foregoing yarns when boiled, 2 cents per pound; when bleached, dyed, or otherwise treated, 5 cents per pound: *Provided,* That the duty on any of the foregoing yarns shall not be less than 25 nor more than 35 per centum ad valorem. Threads, twines, and cords, composed of two or more yarns of flax, hemp, or ramie, or a mixture of any of them, twisted together, the size of the single yarn of which is not finer than eleven lea, 18¼ cents per pound; finer than eleven lea and not finer than sixty lea, 18¼ cents per pound and three-fourths of 1 cent per pound additional for each lea or part of a lea in excess of eleven; finer than sixty lea, 56 cents per pound; and in addition thereto, on any of the foregoing threads, twines, and cords when boiled, 2 cents per pound; when bleached, dyed, or otherwise treated, 5 cents per pound: *Provided,* That the duty on the foregoing threads, twines, and cords shall be not less than 30 per centum ad valorem.

The importers claimed in the protests that the merchandise was dutiable as "cordage of hemp" at 2½ cents per pound under paragraph 1005, which reads as follows:

PAR. 1005. Cordage, including cables, tarred or untarred, wholly or in chief value of manila, sisal, or other hard fibers, three-fourths of 1 cent per pound;

cordage, including cables, tarred or untarred, wholly or in chief value of sunn, or other bast fibers, but not including cordage made of jute, 2 cents per pound; wholly or in chief value of hemp, 2½ cents per pound.

On the trial below the following stipulation was entered into by counsel:

Mr. BALDWIN. Your honor, I believe both sides are prepared to stipulate that the merchandise covered by these protests in so far as it consists of merchandise in diameter of three-sixteenths of an inch or over was within the class of merchandise commercially known as cordage at the time of the passage of the Tariff Act of 1922, and prior thereto.

Mr. CARTER. The Government agrees to that.

It further appears from the record that the halibut lines are composed of two or more yarns of hemp, twisted together, the size of the single yarns being not finer than 11 lea. The lines have been tarred and are used as fishing lines. One is nine thirty-seconds of an inch, and the other four-sixteenths of an inch in diameter. Each, therefore, is slightly more than three-sixteenths of an inch in diameter. In appearance they resemble small ropes.

The importers called three witnesses for the purpose of establishing that the merchandise was excluded by commercial designation from the class of articles known as "cords."

The first witness, Daneman, said that he had been dealing in articles like those involved since about July or August, 1921; that he had sold them in "Alaska, Seattle, and a little in Astoria," and Canada. He also said that he had never heard the involved articles referred to as cords, threads, or twines. He then said:

Q. Do you handle ropes?—A. I do.
Q. How large are your ropes?—A. Twelve-inch. I think that is the largest diameter.
Q. How small do they go?—A. Nothing smaller than three-sixteenths.
Q. Is that the basis of cordage?—A. *Rope and cordage we class as one, that is our base.*
Q. How small does a rope come?—A. Three-sixteenths of an inch in diameter is the smallest; that is the smallest rope. (Italics ours.)

The witness Fotheringham testified that he was manager of the Portland Cordage Co., in Seattle. He said that the smallest rope made in his factory was three-sixteenths of an inch in diameter, and that he had sold cords in Montana and Washington. He further said:

Q. In your experience in the sales of cords have you ever known anything that was called by the trade a cord that was over three-sixteenths of an inch in diameter?—A. They never refer to them as cords; it is cordage.
Q. Past three-sixteenths?—A. Then it is rope.
Q. Is there anything more than three-sixteenths of an inch that has been called a cord?—A. Not that I know of. It is not sold or described as such, although I have had men, strangers, that come to the factory, and who have said, I would like to have a cord to tie up a trunk, but I understood they wanted a small piece of rope.

Q. In speaking of the wholesale trade, you never heard anything above three-sixteenths called cord?—A. No; a cord is made different from a twine.

 *  *  *  *  *  *  *

Q. What is the smallest rope you manufacture?—A. The smallest rope we manufacture is three-sixteenths.

Q. Manufacture anything less than three-sixteenths?—A. Not that can be termed rope. It is cordage thereafter.

Q. The Standard Dictionary defines cord as a string or small rope, made by twisting several strands together; do you agree with the dictionary definition?

 *  *  *  *  *  *  *

Q. Is that according to your understanding of the definition of the word?—A. Yes.

Q. You agree with the dictionary definition?—A. Yes, sir.

Q. Do you manufacture merchandise like Exhibits 1 and 2?—A. Is this it? Not that or that.

 *  *  *  *  *  *  *

Q. How about Exhibit 1?—A. No, sir; we do not manufacture that.

Q. Have you ever manufactured anything like that?—A. We have manufactured a manila rope in that size, and it was tarred.

Q. Never of the hemp?—A. No; we do not work that material at all—never did work it.

The witness Robert J. W. Miller said that his business consisted of "Marine hardware, ship chandlery, and fishing supplies"; that his firm is one of the importers involved in this case—Nordby Supply Co. He said that he had been selling merchandise like that involved since 1910, but that his business was limited to "Portland, Oreg., Astoria, possibly to Frisco, they used a little down there; very little." When asked if he had ever heard merchandise like that involved referred to as cords he said, "I don't know that name."

The Government offered considerable testimony showing in detail how merchandise like that involved is manufactured. It tends to prove that the involved articles can not be manufactured by the use of cordage machinery, and that they are not of that class of merchandise known in the trade as "cordage." In view of the fact that it is stipulated by counsel for the parties that the involved merchandise is known in the trade and commerce of the United States as "cordage," we are unable to understand the purpose of this evidence.

The court below, in an opinion by Weller, Justice, held that the provision for "cords" in paragraph 1004 is more specific for the merchandise in question than the provision for "cordage" in paragraph 1005, and, accordingly, overruled the protests.

It is contended by counsel for appellants that the merchandise is commonly known as "cordage"; that it is not commercially known as "cords"; and that, therefore, the question of relative specificity is not involved in the case. It is admitted by counsel for appellants that the common meaning of the word "cord" is sufficiently broad to include the merchandise in question.

Counsel for the Government contend that the merchandise is within the common meaning of the term "cords"; that it is also commonly and commercially known as "cordage"; that appellants have failed to prove that the commercial understanding of the term "cords" is different from its common meaning; and that, as the provisions for "cords" in paragraph 1004 are more specific for the involved articles than the provision for "cordage" in paragraph 1005, the judgment must be affirmed.

The words "cord," "twine," "cordage," and "rope" are defined in Funk & Wagnalls New Standard Dictionary as follows:

Cord, n. 1. A string or small rope made by twisting several strands together; twine.

Twine, n. 1. A string of some fiber composed of two or more threads or strands twisted together; as binder twine; loosely, any coarse strand or small cord.

Cordage, n. 1. Ropes and cords in general; especially, ropes in the rigging of a ship; hence, anything resembling ropes; as, the twisted *cordage* of vines.

Rope, n. 1. A construction of wire or of twisted fibers, as of hemp, cotton, flax, or jute, so intertwined as to form a thick cord capable of sustaining a severe strain. Commonly rope consists of rope-yarns twisted into three strands that in turn are twisted together. * * * *Technically, the distinction between a cord and a rope, other than of wire, is made at one inch circumference; in popular usage smaller sizes are often termed ropes.* (Italics ours.)

From the dictionary definition of the word "cord," which is agreed to by some, and not denied by other witnesses for appellants, it is evident that the merchandise in question is within the common meaning of the term "cord." It is conceded to be within both the common and commercial understanding of the term "cordage." See *Eagle Pass Lumber Co.* v. *United States*, 11 Ct. Cust. Appls. 134, T. D. 38936. Obviously, then, as the merchandise is within both the common and commercial understanding of the term "cordage," we may disregard much, if not all, of the testimony offered by the Government. While tariff statutes are "drafted in the language of commerce," nevertheless the commercial meaning of a tariff term, in the absence of evidence to the contrary, is presumed to be the same as its common meaning.

Furthermore, it is incumbent upon a party who asserts that a tariff term has a commercial meaning different from its common meaning, to establish that fact by a preponderance of the evidence. *Rice Miller's Association, American Manufacturers* v. *United States and Oberle, Inc.*, 15 Ct. Cust. Appls. 355, T. D. 42560, and cases cited therein. This being so, the stipulation entered into by counsel for the parties that the merchandise is "within the class of merchandise commercially known as cordage at the time of the passage of the Tariff Act of 1922, and prior thereto," in view of the fact that it is concededly within the common meaning of that term, amounts to

nothing more than an agreement that it is within both the common meaning and the commercial meaning of. the term "cordage"; this, in the absence of evidence to the contrary, the law presumes. Accordingly, in view of the fact that the merchandise is also within the common meaning of the term "cords," the first question for determination is: Does the commercial meaning, understanding, and designation of the word "cords" differ from its common meaning, and, if so, is the involved merchandise excluded from the restricted commercial understanding of that term? With respect to this issue, counsel for importers have introduced the testimony of three witnesses. They said that they had never heard the articles in question called "cords." Their testimony is confusing, and, in many instances, beside the point; territorially, their experience has been limited to three or four States. They did not say that, in the trade and commerce of the United States, the term "cords" had a restricted meaning different from the common meaning. Nor did they testify that there was a definite, uniform, and general trade understanding and designation of the term "cords," which excluded the merchandise in question. Therefore, commercial designation has not been established.

It has been stated by counsel for the parties that the term "cordage" embraces only cords and ropes not less than three-sixteenths of an inch in diameter, and the case of *Monroe Foreign Forwarding Co.* v. *United States*, 14 Ct. Cust. Appls. 185, T. D. 41699, has been referred to as authority for that statement. It is true that the court there held that the term "cordage," as understood in the trade and commerce of the United States, embraced only cords and ropes "not less than three-sixteenths of an inch in diameter," but that decision was based entirely upon proof of commercial designation; and as commercial designation is a fact to be proved in each case, there is no presumption that once established it continues. *Draeger Shipping Co. et al.* v. *United States*, 13 Ct. Cust. Appls. 419, T. D. 41341.

In view of the fact that the Congress has provided for "cords" in paragraph 1004, and for "cordage" in paragraph 1005, it is fair to assume that it was intended to distinguish for tariff purposes between "cords" and "cordage." It so happens, however, that the articles in question are within the common meaning of each of those tariff terms. Obviously, then, if they are to be excluded from the provisions for "cords" in paragraph 1004, it must be by virtue of commercial designation. Having failed to make such proof, appellants have failed to make a case, unless the articles are more specifically provided for as "cordage" in paragraph 1005 than as "cords" in paragraph 1004.

The term "cordage" is a generic term and includes "cords," as a species. Obviously, the term "cordage" is more comprehensive

and therefore less specific than the term "cords." In our opinion the involved articles are more specifically provided for as "cords" in paragraph 1004, than as "cordage" in paragraph 1005.

For the reasons stated the judgment is *affirmed*.