(C. D. 1738)

BURROUGHS-WELLCOME Co., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided November 17, 1955)

*Eugene R. Pickrell* (*Richard F. Weeks* of counsel) for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges; OLIVER, C. J., dissenting

WILSON, Judge: The plaintiff in this case imported from Canada certain merchandise, described on the invoice as "Dried Digitalis Lanata Leaves." The collector of customs assessed duty thereon at

the rate of 20 per centum ad valorem under the *eo nomine* provision in paragraph 36 of the Tariff Act of 1930 for "digitalis." Plaintiff claims the merchandise properly dutiable at only 5 per centum ad valorem under paragraph 34 of the said act, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as a drug, advanced in value or condition, or, in the alternative, that it is properly free of duty under paragraph 1669 of the act as a crude drug.

The pertinent provisions of the statutes here in question read as follows:

[Paragraph 36, Tariff Act of 1930]: Coca leaves, 10 cents per pound; digitalis, 20 per centum ad valorem.

[Paragraph 34, Tariff Act of 1930, as modified, *supra*]: Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves * * * , and all other drugs of vegetable or animal origin * * * any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, * * * 5% ad val.

[Paragraph 1669, Tariff Act of 1930]: Drugs such as barks, beans, berries, buds * * * leaves, * * * and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, * * * or any process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: * * *

The record consists of the testimony of six witnesses, all of whom testified on behalf of the plaintiff, together with a sample of *"digitalis lanata"* (plaintiff's illustrative exhibit 1), which, in its imported condition, has been dried and shredded.

The position of the plaintiff is that the *eo nomine* provision for "digitalis" in paragraph 36 of the aforesaid act, both as commonly understood and as used in the trade and commerce of the United States, refers only to a certain type of digitalis known as *"digitalis purpurea."* The position of the defendant, on the other hand, is that said *eo nomine* provision for "digitalis" provides for digitalis in all its forms and that the imported merchandise, being a species of the digitalis family, is properly dutiable, as classified.

Plaintiff's witness Fonda, vice president in charge of the research and development department of the importing concern, stated that his firm was engaged in business as manufacturing pharmacists and chemists. He testified that the imported merchandise, *"digitalis lanata,"* was a botanical plant and that it was used in the production of a drug, known by the trade name of "digoxin" (R. 13), which is used in the treatment of heart ailments. The witness described the *lanata* plant as follows:

A. Well, it is a low growing plant, green in character, that has lance-like leaves, that in length are anywheres from 15 cc to 30 cc long and from four cc to five cc wide; the normal plant, under normal growing conditions, * * * that has a span of eighteen to twenty-four inches in its greatest growth and probably fifteen to eighteen inches high. As it grows up it may throw off a bolting spear which is the flowering spear which may go as high as two feet or higher under cultivation, particularly in well matured and fertilized plants (R. 16).

On cross-examination, the witness testified that the plant "foxglove" was commonly known as "digitalis" and that foxglove, to his knowledge, was *"digitalis purpurea,"* a different species of the digitalis family than the imported *"digitalis lanata,"* here under consideration. He agreed that both species are used for medicinal purposes in the treatment of heart disease (R. 22–23). With respect to differences in the two plants, the witness described the leaf of the *"purpurea"* as a more oblong-shaped leaf, "with a broader stubble and has a fuzzy fur-like coating" and stated that digitalis *"purpurea,"* in its imported condition, was "powdered, very fine," differing in appearance from the imported condition of the *"lanata"* (plaintiff's illustrative exhibit 1).

The process employed in the production of the drug digoxin, by the use of merchandise such as that imported, *"digitalis lanata,"* is best described in the testimony of plaintiff's witness Goff, head of the chemical manufacturing division of the importing firm, who supervised its production, as follows:

The material comes in from our source, British Columbia, it is labelled digitalis lanata. We assay the material to make sure that we find our active drug in the raw material; from that time on, it is first ground to a particle size of approximately eight mesh. After that, it is mixed with a diluted alcohol; it is percolated and the percolate treated with chemicals to remove the fats and tannins, after which these precipitates are filtered off. The clear filtrates are extracted with a solvent which is dried. The solution of glycosides in the dried solvent is then concentrated to obtain the total glycosides of digitalis lanata. These glycosides are further purified by repeated recrystallizations to give us our finished drug of Digoxin. (R. 34.)

The witness explained that a "glycoside" is an alkoid that contains a type of sugar connected to the molecule of that particular alkoid; that *digitalis lanata* contains glycosides, only one of which is isolated, for the purpose of being used in the drug digoxin. He further testified that *digitalis purpurea* also contains glycosides and that, from the *"purpurea"* species, a drug known as "digitoxin" is obtained. He stated, however, that while digitoxin is a glycoside, that particular glycoside is not found in *digitalis lanata* and, further, that the glycoside digoxin is not an ingredient of nor does it occur in *digitalis "purpurea."* (R. 37.)

Plaintiff's witness Ranges, a practicing physician, whose qualifications as a heart specialist were conceded by the defendant, testified that, in the course of his medical experience over a period of 19 years,

he had administered digitalis "In the form of powdered extract; fluid extract, alcohol extract and tinctures." (R. 41.) He stated that, when he writes a prescription for "digitalis as such," very commonly, in such case, it is merely written as "digitalis," with the qualifying words "whole leaf" or "powder," or "tincture" in brackets, depending on the type of administration of the drug, followed by the dosage, and that the digitalis tablets, prepared by the pharmacist, contain *digitalis "purpurea,"* which the witness stated "is the only form that the pharmacist has ever put up in that way."• (R. 44.) He testified that the description "digitalis (whole leaf)" means a powdered leaf—"A digitalis leaf which is powdered and ground up and compressed into a tablet." The witness further stated that he had never seen a tablet made out of *digitalis "lanata"* and that, to the best of his knowledge, such tablets are not used. He then testified that *digitalis lanata,* in its original condition, is never prescribed or used, as such, but that it is only the source material in the production of the drug digoxin, which is one of the glycosides of *digitalis lanata;* that, when digoxin is prescribed, the term "digoxin" is used.

The witness explained that there was considerable difference in the size of the dose between *digitalis purpurea* and the ordinary digoxin dose; the ordinary dose of *digitalis purpurea* is between one-tenth and two-tenths of a gram; "whereas the ordinary therapeutic dose of Digoxin is between 25 hundreds and .5 mg per dose." It was the opinion of the witness that digoxin has superior properties over the "whole leaf digitalis," the *digitalis purpurea.* (R. 50.) On cross-examination, the witness agreed that the drug digitoxin is obtained from the plant *digitalis purpurea* and that such drug, as well as digoxin obtained from the plant *digitalis lanata,* is prescribed by him for ailments of the heart but stated that "They are two different drugs." (R. 53.)

Plaintiff's witness Githens was also a practicing physician, whose stated qualifications indicate wide experience in pharmaceuticals. This witness gave it as his opinion that the imported merchandise, in its dried and shredded condition, has not been advanced in value or condition beyond that essential to the proper packing and the prevention of decay or deterioration pending manufacture. (R. 60.)

Plaintiff's witness Acton was the "works chemist" of the importing company, an experienced and qualified pharmaceutical chemist and analyst, whose duties consisted of employment on private and confidential working formulas for the company and the issuance of such formulas for the manufacture of all the company's preparations. He corroborated the testimony of the previous witness as to the use of *digitalis lanata* in the production of the drug digoxin. Contrasting the indicated processing of the *digitalis "lanata"* with the processing

of the *digitalis "purpurea,"* for the purpose of preparing it for administration to a heart patient, the witness stated as follows:

The powdered digitalis purpurea leaves are purchased from a supplier; they are assayed to determine that they contain the correct potency; the powdered leaves are then mixed with an amount of diluent which is inert matter and after thorough mixing that mixture is compressed on a tablet machine into a compressed tablet, each tablet to contain one grain or 1½ grains or whatever strength is desired.

On cross-examination, the above witness agreed that, in addition to tablets being made out of *digitalis purpurea*, the *purpurea* species is also employed as a source material in the production of the drug digitoxin, obtained by the isolation of one of the glycosides in the product (R. 72).

Plaintiff's final witness was the purchasing agent of the importing firm. He had purchased both the *purpurea* and *lanata* types of digitalis. The testimony of this witness established that, in purchasing the *lanata* species, *"digitalis lanata"* is specified, whereas "digitalis U. S. P. powder, 60 mesh" is indicated in an order for *digitalis purpurea*, and that a delivery of the *"purpurea"* form would not be a compliance with an order for *digitalis "lanata,"* nor would a delivery of *digitalis lanata* be considered as a good delivery against an order for *digitalis "purpurea."*

From the foregoing, it is apparent that while *digitalis purpurea* and *digitalis lanata* are different species of the so-called digitalis family, they differ in use both in manufacture and in the manner of administration for medicinal purposes. The imported merchandise is never administered to a patient, as such, but is merely a source material used to produce the drug "digoxin," after a process of manufacture, whereas *digitalis purpurea* is used not only in the production of another drug, "digitoxin," but can be used *per se* after reduction to tablet form. It has been further established that the active ingredient, digoxin, found in the imported merchandise, is not contained in *digitalis purpurea*.

In our opinion, Congress did not use the term "digitalis," as it appears in paragraph 36, *supra*, as a mere descriptive term denominating all forms of digitalis, but as the *eo nomine* designation of a particular species of the digitalis family, namely, *digitalis purpurea*. Tariff acts are drafted in the language of commerce, which is presumptively that in common use. *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, 182, T. D. 35436. Plaintiff's witnesses, who dealt in digitalis in the trade and commerce of the United States, were of one accord in stating that "digitalis," as used in the pertinent paragraph, referred only to *digitalis "purpurea,"* and such testimony has not been controverted by any evidence on the part of the defendant. This commercial understanding of the term is the same as the common meaning, as indicated by standard dictionary definitions:

Webster's New International Dictionary, 1930 edition, page 623, gives the following definition of "digitalis":

digitalis, *n.* * * * **2.** *Pharm.* The leaves of the purple foxglove (*D. purpurea*), one of the most important drugs, used as a remedy in derangements of the circulatory system. * * *

At page 860:

foxglove, *n.* **1.** Any plant of the genus *Digitalis*. The common foxglove (*D. purpurea*) is an ornamental European perennial or biennial, having racemes of dotted white or purple tubular flowers; * * *. *Its leaves yield the important drug digitalis.* [Italics supplied.]

Funk & Wagnall's New Standard Dictionary, 1939 edition, page 710:

digitalis, *n.* **1.** The dried leaves of foxglove (*Digitalis purpurea*), or a powder, tincture, or the like prepared from them: used as a remedy in diseases of the heart.

At page 972:

foxglove, *n.* **1.** Any plant of the genus, *Digitalis*, especially the English *D. purpurea*, having flowers in long one-sided racemes and leaves of medicinal value. * * *

The above definitions also indicate physical characteristics for *digitalis "purpurea"* different from those indicated in the record for *digitalis "lanata."*

Our conclusion that the term "digitalis," appearing in the tariff act, embraces only the species *digitalis "purpurea,"* is fortified by reference to it in the "Pharmacopoeia of the United States," tenth decennial revision, stated to be "official from January 1, 1926," wherein, at page 126, under the heading "DIGITALIS," it is stated:

Digitalis is the dried leaf of *Digitalis purpurea* Linné.

In Kingzett's Chemical Encylopaedia, 1952 edition, at page 310, we find:

DIGITALIS—* * * . The drug commonly used in medicine consists of the powdered dry leaf of *Digitalis purpurea* which is standardized biologically and may also be used to prepare an alcoholic tincture. * * *

In the same volume, at page 311, it is stated:

**Digoxin** * * * . For medical purposes, it is preferred to preparations of *D. purpurea*, since, being a pure chemical entity, it can be standardized by chemical means and does not require biological standardization.

In the United States Dispensatory, by Horatio C. Wood and Arthur Osol, 23d edition, under the heading "DIGITALIS," at page 367, we find:

* * * When Digitalis is prescribed, Digitalis Pulverata is to be dispensed.

At page 368, seventh paragraph:

For description of *D. lanata* see under *Digoxinum*.

and under the latter heading, at page 373, the following appears:

DIGOXIN

* * * . Chemical investigation has revealed * * * but that the third [lanatoside C] has no counterpart in *D. purpurea*.

It thus appears that, as recognized by lexicographers, scientific, and medical authorities, and by the trade and commerce of the United States dealing in digitalis, such product refers only to that type of digitalis obtained from the species *"digitalis purpurea,"* and we conclude that it was the latter type of digitalis which Congress intended to be covered by the *eo nomine* provision for "digitalis" found in paragraph 36, *supra,* and that said provision does not include the merchandise here imported.

The aforesaid conclusion is strengthened by advertance to the Summary of Tariff Information, 1929, compiled by the United States Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives, in connection with the revision of the Tariff Act of 1922, wherein the provision for "digitalis" first appeared. At page 187 in said summary, the following appears:

DIGITALIS

**Description and uses.**—— * * *

**Production.**—*Digitalis purpurea,* the source of the drug, is a plant native to southern and central Europe. * * * [Italics quoted.]

Further in point, but not necessarily controlling in our disposition of the present matter, is the reference in the Summary of Tariff Information, 1948 edition, volume 1, part 2, wherein, at page 188, the following appears:

DIGITALIS
(PAR. 36)
Comment

Digitalis, or foxglove, consists of the dried leaves of the herb, *Digitalis purpurea.* Only the *purpurea* species is official in the United States Pharmacopoeia, although there are several other species of digitalis, such as *lanata,* that have similar properties. * * *

Our holding that the imported merchandise is not embraced within the *eo nomine* provision for "digitalis" in paragraph 36, *supra,* is consistent with the holding court in *Nylos Trading. Co.* v. *United States,* 21 Cust. Ct. 86, C. D. 1133, affirmed in *Same* v. *Same,* 37 C. C. P. A. (Customs) 71, C. A. D. 422, attention to which has been directed by plaintiff in its brief. It was there held that "palm oil," provided for in paragraph 1732 of the Tariff Act of 1930, refers only to oil obtained from varieties of the palm *"Elaeis guineensis"* and that certain imported pataua oil, obtained from the palm *"Oenocarpus bataua,"* a different species and having different physical and chemical characteristics from the palm oil of commerce, was not classifiable under the aforesaid provision for "palm oil," as claimed, but was properly

classified under paragraph 53 of said act as "all other expressed or extracted oils, not specially provided for," as classified. Other cases to which our attention has been called, need not be discussed, in view of our present conclusion.

The record discloses, and it was conceded by the parties to the controversy, that the imported merchandise, *digitalis lanata*, has therapeutic properties and is chiefly used for medicinal purposes. Hence, it meets requirements for classification as a "drug." *United States* v. *Wm. Cooper & Nephews, Inc.*, 22 C. C. P. A. (Customs) 31, T. D. 47038. In our opinion, the merchandise at bar is properly classifiable as a drug, advanced in value or condition.

The record indicates that the plant *"digitalis lanata"* is dried as soon as it is taken out of the ground and then heat-dried by circulating heated air. It is then ground with a shredding machine, packed in paper bags, and placed in tins for export. Plaintiff's witness Fonda testified that the drying to which the leaves were subjected prevents fermentation and the destroying of the active principle extracted therefrom (R. 21). However, while plaintiff's witness Githens gave it as his opinion "with reasonable certainty" that the drying and grinding of the *digitalis lanata* plant would not advance it in value or condition beyond that essential to the proper packing of it and the prevention of decay or deterioration pending manufacture, there is no showing in this record that the grinding of the leaves was essential for such purposes. Confirmation of this appears from the testimony of plaintiff's own witness Tacke, who testified that he had seen *digitalis lanata* delivered in its imported condition "in the containers in the plant" in the form of "a dried leaf" (R. 73).

On the record presented, we hold the imported *digitalis lanata* properly classifiable under paragraph 34 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as a drug, advanced in value or condition, at the rate of 5 per centum ad valorem, as claimed.

To such extent, the protest is sustained. Judgment will issue accordingly.

#### DISSENTING OPINION

OLIVER, Chief Judge: I regretfully dissent from the decision herein of my associates.

The *"digitalis lanata"* involved herein meets all of the statutory requirements of a drug. It is an uncompounded substance of vegetable origin, containing no alcohol, not edible, and "having therapeutic or medicinal properties and chiefly used for medicinal purposes," paragraph 34 of the Tariff Act of 1930. While this *"digitalis lanata"* is a drug, within the tariff definition of the term, it is not *ipso facto* classifiable either under paragraph 34, covering advanced drugs, or paragraph 1669, relating to crude drugs, because those

paragraphs include only such drugs as are "not specially provided for." In other words, the commodity in question is classifiable under a residuary provision for "drugs" (either paragraph 34 or paragraph 1669), only if it is *not* more specifically provided for under the general provision for "digitalis" in paragraph 36 of the Tariff Act of 1930, where it appears without words of description or limitation.

The record herein, coupled with the definitions cited in the majority opinion, shows that digitalis is a drug, as that term has been legislatively. defined in paragraph 34, *supra*. Digitalis is a plant genus that possesses therapeutic qualities and is chiefly, if not exclusively, used for medicinal purposes. Two of the species, i. e., "*purpurea*" and "*lanata*," form the basis for the present controversy. The evidence herein is positive to the effect that the particular identifying name for each of the species is indicative of the relative strength of the peculiar glycoside that imparts the therapeutic properties in each. "*Digitalis lanata*," the substance in question, is exclusively used in a finished product, marketed under the trade name, "digoxin." "*Digitalis purpurea*," the species upon which plaintiff's theory of the present case is based, is used in a finished product, known as "digitoxin," and, also, is prescribed *per se*, according to dosage and in a form, either "whole leaf," "powder," or "tincture," directed by physicians. Neither the variance in the manner of uses, nor the relative potency of the two species, is a material factor herein. The all-important condition is that both are "drugs," within the tariff understanding of the term.

Since the competing provisions under the present issue involve drugs—digitalis in paragraph 36, as assessed, and drugs, not specially provided for, paragraph 34 or 1669, as claimed—the element of "use" is the controlling principle. *United States* v. *Wm. Cooper & Nephews, Inc.*, 22 C. C. P. A. 31, T. D. 47038. This predominance of the rule of "use" herein renders distinguishable from the present issue the case of *Nylos Trading Co.* v. *United States*, 21 Cust. Ct. 86, C. D. 1133, affirmed in *Same* v. *Same*, 37 C. C. P. A. 71, C. A. D. 422, which the majority follows to support its decision. That case related to so-called "pataua oil," a vegetable oil obtained from fleshy part of the fruit of the palm "*Oenocarpus bataua*," which the collector classified under the general provision for "expressed or extracted oils, not specially provided for." The importer sought classification under the provision for palm oil. The case turned on the principle of commercial designation, which was discussed by the appellate court as follows (p. 81):

* * * The real question is whether as imported the oil from the *Oenocarpus bataua* palm has a commercial designation distinct from that given an article "palm oil" falling under a different classification; or whether there is a com-

mercial distinction between them which brings the oil at bar within the terms of the paragraph where it is assessed. Cf. *Seward* v. *United States*, 9 Ct. Cust. Appls. 4, 9, T. D. 37842; see *Draeger Shipping Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 454, 459, T. D. 42644. Appellant has not proved that the oil of the palm *Oenocarpus bataua* moves at all in commerce under the term "palm oil." The testimony of appellant's own witness tends to show that the oil at bar moves in commerce as "pataua oil," not as "palm oil," and the invoice supports such a conclusion. Even if the government's burden of proving the commercial meaning alleged for "palm oil" were not adequately met, appellant has not shown that the oil at bar is bought and sold under the tariff term. There is ample evidence that the merchandise at bar is not bought and sold under the term "palm oil." The evidence also establishes that a delivery of the merchandise at bar would not be considered as filling an order expressed in the term of the tariff act. Those facts support the trial court's decision under the rule of *Meyer and Lange et al.* v. *United States, supra.*

The importance of the foregoing quotation lies in the observation that the principle of "use," controlling herein, was not a consideration in the cited case. A classification by use prevails over a general classification or even an *eo nomine* designation, in the absence of a clear congressional intent to the contrary, *Julius Forstmann & Co.* v. *United States*, 28 C. C. P. A. 222 (p. 227), C. A. D. 149.

In the case of *Nootka Packing Co. et al.* v. *United States*, 22 C. C. P. A. 464, T. D. 47464, it was held that "an *eo nomine* statutory designation of an article, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of said article." This principle of tariff construction applies herein. The *Nootka Packing Co. et al.* case, *supra*, was concerned with the classification of clams that had been cut into pieces, cleaned, cooked, and then packed in the cans filled with a brine, partly salt and partly fresh water, for seasoning and delivery. In reaching its conclusion, the court said:

* * * Paragraph 721 (b) of the Tariff Act of 1930 provides for "Clams, clam juice, or either in combination with other substances, packed in air-tight containers." It will be observed that this language is not restricted to clams in their raw or natural state, nor is it restricted to entire clams. It includes any clams in any condition, so long as they are clams.

The same reasoning can be invoked with equal force in the present case. Here, our consideration is directed to the provision for "digitalis," a tariff designation without modification of any kind. It is a drug, within the tariff definition of the term (paragraph 34, *supra*), and, as such, it is not restricted to any individual species of the genus plant. In other words, as a drug, classification thereunder is controlled by the element of "use," and as an *eo nomine* designation, it is all embrasive, contemplating all species of digitalis, without regard to their form. Thus, the *"digitalis lanata"* in question is

properly classifiable as digitalis under paragraph 36, as assessed by the collector.

This consistent tariff treatment of all species of digitalis lends support to the congressional intent for uniform classification of drugs. The statutory definition of a "drug" was originally enacted in paragraph 34 of the Tariff Act of 1922. Explanation for this legislation appears in the Summary of Tariff Information, 1921, prepared by the Tariff Commission for the information of the Committee on Finance of the Senate, as follows (pp. 90–91):

BOTANICAL DRUGS.

(See Survey A–7.)

*Production.*—The drugs listed under this paragraph and under paragraph 1562 of the free list are extremely numerous and for the most part are of strictly foreign production. Most of those produced domestically are not grown elsewhere. * * * The quality of American drugs excels that of imported products, because of scientific research and methods of cultivation. Among such domestic drugs are belladonna, digitalis, cannabis, henbane, valerian, insect flowers, and Levant wormseed. Important products not commercially cultivated here are senna, rhubarb, quassia, orris root, scammony, squills, and colocynth.

*      *      *      *      *      *      *

*Important changes in classification.*—As the term "drugs" has under past acts been *interpreted in different ways,* it has been defined as applying only to articles having chief use in medicine. [Last italics supplied.] Gums were omitted, as they are seldom used medicinally. The provision for all other drugs was expanded to include those of animal origin. * * *

The majority opinion refers to the Summary of Tariff Information, 1929, compiled by the United States Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives, in connection with the revision of the Tariff Act of 1922. This publication is used by my associates to support their conclusion, limiting the scope of the provision for "digitalis" to *"digitalis purpurea"* only. The excerpt quoted in the majority opinion does not fully reflect the information supplied in that volume under the title, "DIGITALIS" (p. 187). A complete reading thereof shows that Congress was informed that "Digitalis has become established as a common weed of waste and range lands in Oregon, Washington, and British Columbia," and that "Very recent reports have indicated a small commercial cultivation of digitalis on Vancouver Island, British Columbia," the source of the imported product under consideration.

For all of the reasons hereinabove set forth, the protest should be overruled, and the decision of the collector should be affirmed.