BLOOMINGDALE BROS. *v.* UNITED STATES (No. 126).   HAGUE & Co. *v.* UNITED STATES (No. 127).   PRATT & FARMER Co. *v.* UNITED STATES (No. 128).   STEINHARDT & BRO. *v.* UNITED STATES (No. 129).[1]

1. DEPARTMENTAL PRACTICE.

   Departmental practices and usages, however uniform and long continued they may be, are nothing more than aids to the court in construing a law of doubtful import, and in no case can they be invoked to defeat the legislative will expressed in clear, unambiguous, and unequivocal terms.   Here, however, a long-continued and uniform departmental construction is not shown.

2. "NOT PLATED" IN PARAGRAPH 188, TARIFF ACT OF 1897.

   Whether paragraph 188 be considered independently or in its relation to other parts of the law, there is no ground either in its legislative history or its administrative construction for going beyond its express terms in fixing its meaning.   No commercial designation is shown, and according to the very terms of the paragraph all the hairpins or safety pins of the importation overlaid or coated with precious or base metals were "plated" within those terms.

United States Court of Customs Appeals, May 8, 1912.

TRANSFERRED from United States Circuit Court for Southern District of New York, Abstract 21009 (T. D. 29690).

[Affirmed.]

*Comstock & Washburn* (*Albert H. Washburn* and *George J. Puckhafer* of counsel) for appellants.

*William K. Payne*, Deputy Assistant Attorney General, for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

The appellants in this case imported at the port of New York during the year 1907 several invoices of hairpins and safety pins made of base metal.   The chemist attached to the laboratory of the United States appraiser's office at New York officially reported that all the hairpins were plated with gold; that some of the safety pins were plated with tin, some of them with nickel plate, and that still others were either lacquered or enameled.   With the exception of certain black enameled pins, which were assessed for duty under paragraph 188, the collector of customs classified all the pins as hairpins and safety pins, plated, and assessed them for duty at 45 per cent ad valorem under the provisions of paragraph 193 of the tariff act of 1897

---

[1] Reported in T. D. 32530 (22 Treas. Dec., 840).

as articles of metal not specially provided for.  Said paragraph reads as follows:

193. Articles or wares not specially provided for in this act, composed wholly or in part of iron, steel, lead, copper, nickel, pewter, zinc, gold, silver, platinum, aluminum or other metal, and whether partly or wholly manufactured, forty-five per centum ad valorem.

The classification and duty assessed did not meet the approval of the importers, and accordingly they filed in due time with the collector protests in which they set up that the goods were hairpins and safety pins composed wholly of brass or other base metal, not plated, and not commonly known as jewelry, and therefore dutiable under the provisions of paragraph 188 of said act, which said paragraph reads as follows:

188. Pins with solid heads, without ornamentation, including hair, safety, hat, bonnet, and shawl pins; any of the foregoing composed wholly of *brass*, copper, iron, steel, *or other base metal, not plated, and not commonly known as jewelry*, thirty-five per centum ad valorem.

The Board of General Appraisers found that the black enamel pins had been properly assessed for duty under paragraph 188, sustained the protests as to the lacquered pins, and overruled the protests in all other respects.

There is no dispute as to the nature, character, and composition of the merchandise, and the only real issue raised on the appeal seems to be the meaning which should be given to the expression "not plated" as it is used in paragraph 188.

Counsel for the appellants in a very complete brief argue that "not plated" means "not plated with jewelry plate," and that the phrase "not plated and not commonly known as jewelry" in paragraph 188 should be interpreted as if it read "not plated with jewelry plate so as to be commonly known as jewelry."  In aid of this construction attention is called to the history of the legislation and to what is claimed to be a long-continued departmental practice justifying the interpretation advocated by the appellants.  The construction put upon a law by the department of the Government charged with its execution, if uniform and long continued, should, as counsel say, have great weight with the courts in reaching a conclusion as to the true intention of the legislator—not in every case, however, but only in those cases where an examination of the statute discloses that its meaning is doubtful or obscure.  United States *v.* Healey (160 U. S., 136, 145); Komada & Co. *v.* United States (215 U. S., 392, 396).  Departmental practices and usages, however uniform and long continued they may be, are nothing more than aids to the court in construing a law of doubtful import, and in no case can they be invoked to defeat the legislative will expressed in clear, unambiguous, and unequivocal terms.  Robertson *v.* Downing (127 U. S., 607, 613).  Whether paragraph 188 be regarded as

of plain or of doubtful meaning, however, we are of opinion that the evidence adduced by the importers was not sufficient to establish the departmental construction claimed by them. From about April, 1905, until the time of the hearings in 1908, the Government examiner, Van Houten, continued to pass merchandise similar to that imported as manufactures of metal under paragraph 193 of the tariff act of 1897.

From early in 1900 until the time of the hearings Government Examiner Bruen passed on German and French pins of the same character as those under consideration and returned them for duty, not under paragraph 188, but under paragraph 193. If the testimony of these two witnesses was inexact it could have been impeached by the official records, and such an impeachment was not attempted. If their testimony is correct, then the witnesses for the importers, giving them credit for good faith and an honest purpose to tell the truth as they saw it, were either speaking of a time anterior to the tariff act of 1897 or of a class of goods which was in fact not plated, although bearing that appearance. We incline to the latter view, especially as Bruen declares that sometimes the difference between plated and unplated pins was not distinguishable by the eye and that on occasions, in order to determine whether pins were or were not plated, a chemical examination was required. But however that may be, and even if we had any reasonable doubt as to the true meaning of the provision, which we have not, it is certain that the importers failed to establish any such *long-continued* and *uniform* departmental construction of paragraph 188 as would warrant its adoption by this court.

Neither does the legislative history of paragraph 188 lend any strength, in our opinion, to the interpretation put upon it by the protestants. Pins are mentioned *eo nomine* for the first time in the tariff act of 1816, which imposed a duty of 20 per cent ad valorem on "pins * * * of all kinds." This provision became "pins, solid head or other," in the tariff act of 1862, which levied on that class of merchandise a duty of 5 per cent ad valorem in addition to that previously imposed. Hairpins *eo nomine* made their first appearance in the tariff act of 1870, which laid a duty thereon of 50 per cent ad valorem. The provision for hairpins was not repeated, however, in the tariff act of 1883, and in consequence it was held that Congress having once made a distinction between hairpins and pins, hairpins could not be assessed for duty under the designation for "pins, solid head or other," which had been carried bodily from the act of 1862 into that of 1883, although it seems that mourning pins, hatpins, bonnet pins, shawl pins, and safety pins might be so assessed. Robertson *v.* Rosenthal (132 U. S., 460, 464); Dieckerhoff *v.* Robertson (44 Fed. Rep., 160). Apparently, as a result of these decisions and to set at rest, as far as

might be, any doubt as to what pins should bear the 30 per cent rate, the provision for "pins, solid head or other," which had stood for 28 years or more, was changed by the tariff act of 1890 so as to read:

Pins, *metallic*, solid head or other, *including hairpins, safety pins, and hat, bonnet, shawl, and belt pins*, thirty per centum ad valorem.

About this time various kinds of fancy and ornamental pins for the hair, bonnets, hats, laces, belts, and shawls made their appearance, and were assessed by the collectors of customs as jewelry, evidently because they were commercially known as jewelry. The Board of General Appraisers held, however, that though these pins were known commercially as jewelry they were nevertheless provided for *eo nomine* under paragraph 206 of the tariff act of 1890 and that they should be assessed at the rate therein prescribed instead of at the jewelry rate. *In re* Bacharach & Freedman (T. D. 13307); *In re* Blumenthal & Boas (T. D. 13238).

Evidently Congress was not satisfied that pins, whether commercially known as jewelry or not, should pay duty simply as pins, and accordingly paragraph 206 of the tariff act of 1890 was amended by paragraph 170 of the tariff act of 1894 so as to exclude pins commercially known as jewelry. That amendment, however, did not seem to meet the situation, at least from the point of view of those who were engaged in the manufacture of jewelry and allied articles, and therefore, when the tariff act of 1897 was under consideration an earnest effort was put forth to secure such further amendment to the pin paragraph as would protect the manufacturers of jewelry from what was claimed to be the unfair competition of articles manufactured abroad.

And right here is where the Government differs with the importers as to what was sought by the domestic interests concerned. What were the articles which it was the desire of the manufacturers of jewelry to eliminate from paragraph 170 of the act of 1894? We think the record of tariff hearings had before the Ways and Means Committee of the Fifty-fourth Congress rather favors the contention of the Government that the manufacturers of jewelry did not limit their energies to the exclusion from the pin paragraph of articles made of the precious metals or plated with the same. Indeed, if the classification suggested by one of them to the committee may be accepted as a true index of their real purpose, they sought to include in the enumeration of jewelry not only articles made of gold, silver, or platinum, or plated therewith, but also articles commonly known as jewelry made of any base metal, *or imitation thereof*, and whether in a natural finish or electroplated with nickel, which is a base metal.

This is the legislative history of the paragraph under consideration, and in it, so far as we are able to discern, there is nothing which even tends to show that Congress made use of the term "plated" in a special or limited sense, or that it intended that the term should be

applied only to articles overlaid with the precious metals. In fact, if the circumstances attending the legislation permits of any deduction at all, it is the deduction that that which was least desired by those interested was an amendment to the law which would have excluded only such pins as were plated with precious metals so as to be commonly known as jewelry. With such an amendment unplated pins made wholly of the metals mentioned would have continued to be dutiable as pins and not as jewelry, although they might be both commonly and commercially·known as jewelry, and such an outcome can scarcely be presumed to have been intended by Congress or by the manufacturers of jewelry who set in motion the wheels of legislation to accomplish a much broader purpose.

But even if the departmental construction of paragraph 188 and the history of the legislation had been such as is claimed by counsel for the appellants, we could have recourse to neither for the interpretation of the paragraph in question. To ascertain the·meaning of a statute resort must first be had to the statute itself. If it is couched in language which is not vague, dubious, uncertain, or ambiguous, and if its literal interpretation gives it a definite meaning which does not necessarily lead to injustice, oppression, or an absurd result, and which does not jar with any fixed policy of the Government or a legislative declaration in force, that meaning must be accepted by the courts. In such a case there is no room for construction. Whether paragraph 188 be considered independently or in its relation to other parts of the law, there is nothing in it which would·reasonably warrant the court in believing that Congress did not mean exactly what it said, and consequently there is no excuse for resorting to a series of *a priori* deductions when the meaning of the statute may be better ascertained by reading it.

When used in the connection employed in the paragraph, "to plate," as commonly understood, means:

1. To cover or overlay with gold, silver, or other metals, either by a mechanical process, as hammering, or by a chemical process, as electrotyping (electroplating?).—Webster's International Dictionary.

2. To overlay or coat with silver, gold, or other metal; specifically, to attach a permanent covering or film of one metal to (the surface of another).—Century Dictionary.

3. To coat with a thin layer of metal, as silver or gold, by electro-deposition, hammering, or otherwise; as *plated* tableware.—Standard Dictionary.

4. To cover with a thin coating or film of metal; esp. to cover articles made of the baser metals with gold or silver; also iron with tin.—Oxford Dictionary.

"To plate" may have a commercial meaning, and it is entirely probable that to importers of jewelry and wholesale dealers therein plating may signify the covering or overlaying of base metals with a thin film of gold or silver. If, however, there was any such commercial meaning, the burden was imposed on the importers to show it by proper evidence, because although Congress is presumed to have

employed in its tariff act terms according to their commercial meaning, that commercial meaning, in the absence of anything to the contrary, must be assumed to be the ordinary meaning. Acker *v.* United States (1 Ct. Cust. Appls., 328, 333; T. D. 31431) and cases cited.

The appellants having failed to show that the paragraph has a commercial signification which differs in any way from its ordinary meaning, we must find that all of the hairpins or safety pins overlaid or coated with precious or base metals are plated within the meaning of paragraph 188, and that as to that class of merchandise the protests were properly overruled.

Had the record in this case justified the conclusion that the pins were made up of an alloy of tin and brass instead of being plated with tin a different question would have been presented and one which would not necessarily lead to the conclusion here reached.

The decision of the Board of General Appraisers is *affirmed.*