(C. D. 323)

F. F. G. HARPER Co. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 25, 1940)

*Harper & Harper (Walter I. Carpeneti* of counsel) for the plaintiff.
*Joseph R. Jackson,* Assistant Attorney General *(Daniel I. Auster, Joseph F. Donohue,* and *John J. McDermott,* special attorneys, and *Richard H. Welsh* and *Joseph E. Weil,* special attorneys), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges; CLINE, J., not participating

EVANS, Judge: This is a suit against the United States wherein the plaintiff seeks to recover a certain sum of money claimed to have been illegally collected and paid as customs duties on an importation of merchandise entered at the port of San Francisco, Calif., under the name of glue stock, which was classified by the collector of customs at said port as dried blood albumen, dark, and assessed for duty at 6 cents a pound under paragraph 701 of the Tariff Act of 1930. Against this classification the importer filed the following protest:

All the merchandise assessed at 6¢ per pound under paragraph 701, as dried blood albumen, dark, should be assessed free of duty under paragraph 1625 (dried blood, etc., or free of duty under paragraph 1689 (glue stock, etc.) or free of duty under paragraph 1685 (fertilizer, etc.), or free of duty under paragraph 1605 (albumen, etc.).

It is further claimed that duty should have been imposed at the rate of 10 per cent or 20 per cent under paragraph 1558 or at the rate at which entered. It is claimed that the merchandise is dutiable directly under the paragraphs or sections referred to, or by reason of similitude or of component material of chief value under the provisions of paragraph 1559, or by virtue of section 502 (c). Each of the claims asserted herein is made with the proviso and condition that the rate claimed is lower than the rate assessed. This protest is intended to apply to all goods covered by the entries referred to, of the same kind or character as the goods specified, whether or not particularly enumerated herein.

We quote herewith the provisions of the statute involved as follows:

PAR. 701. Cattle, weighing less than seven hundred pounds each, 2½ cents per pound; weighing seven hundred pounds or more each, 3 cents per pound; beef and veal, fresh, chilled, or frozen, 6 cents per pound; tallow, one-half of 1 cent per pound; oleo oil and oleo stearin, 1 cent per pound; dried blood albumen, light, 12 cents per pound; dark, 6 cents per pound.

Free List.

PAR. 1625. Blood, dried, not specially provided for.

PAR. 1689. Hide cuttings, raw, with or without hair, ossein, and all other glue stock.

PAR. 1685. Guano, basic slag (ground or unground), manures, and (notwithstanding any other provision of this Act) those grades of all other substances used chiefly for fertilizers, or chiefly as an ingredient in the manufacture of fertilizers.

PAR. 1605. Albumen, not specially provided for.

The plaintiff called two witnesses and submitted two depositions in support of his case and the defendant's record is made up of the depositions of seven witnesses. A sample of the merchandise in suit was admitted in evidence after proper identification and said sample was thereafter divided so as to permit the plaintiff to procure an analysis of the same by its chemist. Another portion of said sample was transmitted to the collector of customs at the port of Chicago, Ill., where it was submitted to the different witnesses whose depositions were taken at that port.

The plaintiff's first witness was the Government chemist at San Francisco upon whose examination the classification was made by the collector. He described briefly the tests which he had made and upon which he relied for his conclusion that the commodity was dried blood albumen, dark. He stated that his test consisted of "solubility determination, and also the determination of the total nitrogen and protein content." He further said that he had made a microscopic examination and found neither white nor red corpuscles present. This witness was permitted to answer on cross-examination without objection the following questions:

X Q. Do you know whether or not that merchandise is similar to that in any case decided by the United States Customs Court?—A. Yes, sir; it is similar to the merchandise which is the subject of T. D. 47788.

Mr. AUSTER. No further questions.

Redirect examination.

By Mr. CARPENETI:

R. Q. Are you familiar with the decision of the court in T. D. 46270 (showing decision to witness)?—A. I have a copy of this decision.

R. Q. Do you know whether or not the instant merchandise is the same or similar?—A. The merchandise in this case is not the same as the merchandise the subject of T. D. 26270 [46270?].

 * * * * * * *

A. Exhibit 1 consists of dried dark blood albumen, whereas the merchandise the subject of T. D. 46270 is. a commodity in the form of a powder, which the record shows contained both red and white blood corpuscles.

R. X Q. Based upon your examination or analysis, does exhibit 1 before the court contain red and white blood corpuscles?—A. No sir.

The next witness was Mr. Fred H. Eldred, a commercial chemist who had studied at Pomona College at Los Angeles, and had done post graduate work at Stanford University, was assistant in the department of physiological chemistry there, and at the time of testifying was a commercial chemist in San Francisco. He stated that he had received a portion. of the sample introduced in evidence (Exhibit 1) and was requested to determine (1) whether it was dried blood, (2) whether it was blood albumen, or (3) whether it was dried blood containing blood albumen, and lastly, if it contained white blood corpuscles. He gave it as his opinion that the commodity was dried blood containing blood albumen. He also said that the sample in question contained numerous red and white blood corpuscles. He undertook to fortify his testimony by making a series of tests, described in his evidence, upon a sample of fresh cattle blood. Against the test of the fresh cattle blood he compared similar tests of the instant merchandise and also procured a sample of what he termed "technical blood albumen" which he purchased in the market. According to his evidence Exhibit 1 (a portion of which was referred to by him as Exhibit 2) showed the presence of 0.41 per centum iron oxide ($Fe_2O_3$), the blood serum prepared by him from the fresh blood, which he called blood albumen, carried 0.08 per centum of iron oxide and the dried corpuscles plus unseparated portion of serum that remained after removing the dried blood albumen above noted ran 0.37 per centum iron oxide, while the technical blood albumen purchased in the open market contained 0.11 per centum iron oxide.

It appears to the court that there would have been a much simpler and more accurate, certainly more satisfactory, method of proving what the instant material is by having the depositions of the persons who made it. On the rulings made by the court upon objection by the plaintiff the defendant was compelled to take out depositions for its case and no reason appears why the plaintiff might not have done the same thing. We are informed of the method adopted by the expert in his various stages of producing substances to be analyzed but we are entirely in the dark as to how the instant merchandise was produced. For instance, we do know the drying temperature used in making the experimental products tested. The record does not disclose how the witness procured his total albumen and he states that he does not know the difference between dried blood albumen, dark, and dried blood albumen, light, but is of the opinion that the light is a refinement of blood albumen. Whether the instant commodity is made by the Austrian method of separation or the

American method is not disclosed, and in view of the fact that there must have been available to the plaintiff competent evidence as to the details of the manufacture of the imported merchandise which he did not procure, we are not disposed to give much weight to the experimental tests made by his expert.

Since Congress provided for the taxation at different rates of two dried blood commodities differing in name, it must have had in mind that there were being imported into this country two substances differing in physical or other characteristics, even though this competent chemical expert did not know the difference. This may be accounted for because Congress was dealing with the matter in a commercial way, while the chemist's knowledge was technical.

This case presents a situation where it is proper and helpful to look up the legislative history of the paragraph so that we may determine if possible what Congress had in mind when it prescribed a rate of duty for dried blood albumen, dark, and another rate for dried blood albumen, light.

There are many decisions holding that resort may be had to legislative history and to the hearings before Congress when it was considering proposed tariff legislation where it seems necessary and advisable to have such information in order to determine the meaning of the terms used in the tariff act as adopted. See *Bloomingdale* v. *United States*, 3 Ct. Cust. Appls. 204, T. D. 32530; *Brown & Co.* v. *United States*, 6 Ct. Cust. Appls. 415, T. D. 35977; *United States* v. *Beadenkopf Co.*, 8 Ct. Cust. Appls. 283, T. D. 37539; *United States* v. *Bacharach Industrial Instrument Co.*, 13 Ct. Cust. Appls. 262, T. D. 41203; *United States* v. *Freitag & Sons, Inc., et al.*, 21 C. C. P. A. (Customs) 500 T. D. 46961; *Ralph C. Coxhead Corp.* v. *United States*, 22 C. C. P. A. (Customs) 96, T. D. 47080.

These terms "dried blood albumen, dark, and dried blood albumen, light" are new in the 1930 act and the reasons for their adoption seem perfectly clear from the following colloquy as recorded in Vol. 7 of the Hearings before the Ways and Means Committee of the House of Representatives, where at page 4010 appears a statement by a witness for the manufacturer of products from the blood of cattle. He states, among other things, that he desires "to present to the committee facts showing the necessity for an import duty upon blood albumen and soluble dried blood." On page 4011 he states:

Blood albumen is a dried product, made from the blood of cattle. The blood of the slaughtered animals is caught on the killing floors and taken to the separators, wherein the serum is separated from the corpuscles. The serum thus recovered is further processed by removing the fibrin and fatty substances, and is then dried. This product is commercially known as "light-blood albumen."

The corpuscles which remain after the serum is removed is then taken from the separators to the driers, and the resulting product is commercially known as "dark-blood albumen."

Again on page 4012:

It is recommended that the committee in order to protect the development of this industry and equalize costs of production should provide a duty of 12 cents per pound on light-blood albumen and 6 cents per pound on soluble dried blood or dark-blood albumen. It should be understood that dried blood is imported and used in this country for agricultural purposes in the manufacture of livestock and poultry feeds and fertilizer. However, we have no desire to suggest an import duty upon dried blood used for agricultural purposes. It is therefore recommended that there be added to paragraph 705 of schedule No. 7 relating to agricultural products and provisions, the following:

Light-blood albumen, 12 cents per pound; dark-blood albumen, and dried blood, except for fertilizer and feeding purposes, 6 cents per pound.

On page 4013 of this publication is found the following:

Mr. CRISP: Is this albumen, on which you are asking a duty, used in commercial fertilizer?

Mr. HOERTER: No, sir. They are two entirely different products. The product we have in mind is perfectly soluble in water, and when we say 12 cents a pound, you must bear in mind that these users in the leather industry, and the textile people when using this product I have in mind, put 80 per cent of water with it, and bring it back to about the consistency of blood, to make a liquid out of it. What you have in mind is a product that is dried under intense heat, and is insoluble.

In the Hearings before a Subcommittee of the Committee on Finance of the Senate, Vol. XVI, p. 118, in a brief submitted by a witness before the committee we find the following:

Blood albumen is a dried product, made from the blood of cattle. The blood of the slaughtered animals is caught on the killing floors and taken to the separators, wherein the serum is separated from the corpuscles. The serum thus recovered is further processed by removing the fibrin and fatty substances, and is then dried. This product is commercially known as light blood albumen.

The corpuscles which remain after the serum is removed is then taken from the separators to the driers, and the resulting product is commercially known as dark blood albumen. From each 100 pounds of liquid blood there is obtained 4.25 of light blood albumen and 14 pounds of soluble dried blood or dark blood albumen.

From the foregoing statements and from the fact that Congress adopted the language used by the witnesses there, it is clear that dried blood albumen, light, referred to the clear albumen removed after defibrination, and that dried blood albumen, dark, was considered to be a product obtained by drying what was left of the blood after the light albumen had been removed, which, according to the evidence, did contain red and white blood corpuscles with some albumen. Its principal characteristic was high solubility and it is clear that it was not intended that this term should include any product used as a fertilizer or for feed, such as dried blood.

· Two experts have defined the commodity before us as dried blood albumen, dark, and have given supporting reasons therefor, the reasons being the usual and commonly accepted test applied for determining identity of this commodity. The chemical expert for the

plaintiff being uncertain as to what is meant by the term dried blood albumen, dark, was consequently not competent to state whether the instant merchandise is or is not such a commodity. It was his opinion that it is dried blood.

As to the alternative claims that the merchandise is free of duty as glue stock or as fertilizer, we point out that either of these claims, being based upon a designation by use, must be established by proof of chief use. It has been held that chief use—

may be shown either by the character of the article itself, as imported, wherein it is evidenced that it is intended and susceptible to but a single use, declared by the statute, or that it may be shown by proof that it is intended and serviceable substantially for the purpose alone declared by the statute within the terms of which it is claimed to be dutiable. That is to say, that it may be brought within the terms of the statute either by evidence manifested by the articles *per se* or given at the trial. That is the accepted doctrine and the one which has received the approval of this court. *United States* v. *Lyon*, 4 Ct. Cust. Appls. 438 at 442, T. D. 33873, citing cases.

As imported there is nothing about this commodity which would indicate its intended use and the testimony falls far short of showing that it is chiefly used for either glue stock or fertilizer.

Having decided that the commodity is dried blood albumen, dark, which is provided for *eo nomine* in the act, we overrule the claim for free entry under paragraph 1605, *supra*, as albumen, not specially provided for.

It is the court's opinion that the protest should be and the same is hereby overruled.

Judgment will be rendered accordingly. It is so ordered.