**BIDDLE SAWYER CORP.**

**v.**

**UNITED STATES.**

**C.D. 2310; Protest Nos. 15/14142 etc.**

United States Customs Court,
First Division.
Jan. 22, 1962.

John D. Rode, New York City (Ellsworth F. Qualey, New York City, of counsel) for plaintiff.

William H. Orrick, Jr., Asst. Atty. Gen. (Richard E. FitzGibbon, New York City, trial attorney), for defendant.

Before OLIVER, MOLLISON and WILSON, Judges.

WILSON, Judge.

The merchandise in the case at bar consists of a certain substance known as polyvinyl pyrrolidone, commonly referred to as PVP. It was classified under paragraph 2 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, as a nitrogenous compound of vinyl alcohol and assessed with duty at the rate of 3 cents per pound, plus 15 per centum ad valorem. The plaintiff claims that the merchandise is properly classifiable under paragraph 5 of the tariff act, as modified by T.D. 52739, supra, as a medicinal preparation

at 12½ per centum ad valorem. Specifically, plaintiff contends that the merchandise is properly classifiable as a medicinal preparation by reason of a long-established practice of classifying merchandise of the character here imported as a medicinal preparation, and, further, that the merchandise at bar is, in fact, a medicinal preparation.

The pertinent statutes and regulations herein involved are as follows:

Paragraph 2, Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739:

> " * * * * *

"allyl, alcohol, crotonyl alcohol, vinyl alcohol, * * *

> * * * * *

ethers, esters, salts and nitrogenous compounds of any of the foregoing, whether polymerized or unpolymerized; * *

> * * * * *

all the foregoing not specially provided for * * *...........3¢ per lb. and 15% ad val."

Paragraph 5, Tariff Act of 1930, as modified by T.D. 52739, supra:

> * * * * *

"All chemical elements, all chemical salts, and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for * * *..............12½% ad val."

Section 315(d) of the Tariff Act of 1930, as modified by the Customs Simplification Act of 1953:

> "(d) No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such

ruling; but this provision shall not apply with respect to the imposition of antidumping duties."

Section 16.10(a), Customs Regulations, 1954:

> "16.10 Change in classification or value; higher or lower rate; effective date.—(a) If there is an established and uniform practice at the various ports, a change in classification resulting in a higher rate of duty, except as the result of a court decision, shall be made only upon the Bureau's instructions and shall be applicable only to merchandise entered for consumption after the expiration of 90 days after the date of the publication of the Bureau's instructions in the Treasury Decisions. In the case of merchandise entered for warehouse, such change shall apply to goods withdrawn for consumption after the expiration of such 90-day period, provided the warehouse entry is unliquidated or can be reliquidated within 60 days after the date of liquidation."

Plaintiff introduced in evidence a number of exhibits relative to its claim that there was a long-established and uniform practice of classifying merchandise, such as that here imported, under paragraph 5 of the tariff act as a "medicinal preparation" (plaintiff's collective exhibits 1 and 2, and plaintiff's exhibits 3, 4, and 5). Reference to the exhibits in question will be made as deemed pertinent to a determination of the issue herein.

Plaintiff's first witness was Mr. Jack D. Haim, a registered pharmacist and vice president of Biddle Sawyer Corp., importer of pharmaceuticals, industrial chemicals, and essential oils. He testified that the merchandise under consideration was purchased from the manufacturer as pharmaceutical grade PVP suitable for tabletting and sold exclusively to Abbott Laboratories, Chicago, Ill., as "polyvinyl pyrrolidone, Kollidone 25, tabletting grade" (R. 14–17). The witness stated that he first started importing this merchandise in August or September 1956. It appears that, prior

to importation, at that time, the importer herein made inquiry of certain officials at the customhouse in New York relative to the proper rate of duty applicable to polyvinyl pyrrolidone, pharmaceutical grade. Mr. Haim stated that he was informed, at that time, that such product would be classifiable as "a pharmaceutical, medicinal compound" (R. 19–22). When these initial shipments arrived, certain notices (plaintiff's collective exhibit 1) were received from the appraiser advising the plaintiff that the merchandise there involved, which was entered under paragraph 5 at the rate of 11 or 11½ per centum ad valorem, would be advanced to 12½ per centum ad valorem under paragraph 5, the rate of duty covering medicinal preparations. Subsequently, it appears that, on or about October or November 1957, the importer was notified by the appraiser that certain polyvinyl pyrrolidone, which had been entered under paragraph 5 of the tariff act at the rate of 11½ per centum or 12½ per centum ad valorem, would be advanced to a rate of 3 cents per pound and 15 per centum ad valorem and would be classifiable under paragraph 2 of the act (plaintiff's collective exhibit 2) (R. 32). A copy of a letter, dated January 9, 1958, addressed to customs officials at New York by the importer herein inquiring as to the rate of duty on polyvinyl pyrrolidone "Technical Grade for industrial use and pharmaceutical grade" (plaintiff's exhibit 3), elicited the following reply:

"* * * you are advised that the pharmaceutical grade is dutiable at 12½% ad valorem under paragraph 5, and the technical grade is dutiable at 3¢ per lb. plus 15% ad valorem under paragraph 2 of the Tariff Act of 1930, as amended." [Plaintiff's exhibit 4.]

It appears that all shipments of PVP made to the importer herein are now being classified under paragraph 2 of the tariff act at a duty rate of 3 cents per pound and 15 per centum ad valorem (R. 33).

Mr. Haim further testified that the pharmaceutical grade PVP is used in tabletting "as a binder for the proper release of the active ingredients which are contained in the tablet" (R. 37); that the term "pharmaceutical grade" means "that the material is of a sufficient purity that it meets certain standards, and that it is commonly used, and can be used, by the pharmaceutical industry in the production of pharmaceuticals." He stated that it does not mean that the particular material, to which the term is applied, must necessarily have a therapeutic value (R. 38), and that, generally speaking, the product sold by his concern does not have therapeutic value (R. 39).

Plaintiff called as its second witness, Dr. Joseph L. Kanig, associate professor of pharmacy, Columbia University, New York City, who teaches pharmaceutical sciences, in the undergraduate division, and industrial pharmaceutical manufacturing, in the graduate division of said university. The record further discloses that the witness is a consultant to manufactures of pharmaceutical products and, in such capacity, has become familiar with polyvinyl pyrrolidone (R. 43). Dr. Kanig testified substantially as follows: That there are three grades of PVP known to commerce: (1) A technical or commercial grade; (2) a pharmaceutical grade; and (3) a more highly purified product "used in plasma, or blood extending work" (R. 44). He described the term "pharmaceutical grade" as "The material of sufficient purity which meets certain specified standards, which would be acceptable for use in dosage forms in the pharmaceutical industry" (R. 45), stating, in this connection, that the principal use for PVP pharmaceutical grade is in granulating or production of tablets for human consumption. Dr. Kanig further testified that polyvinyl pyrrolidone is also used as a "complexing agent" in the production of a so-called complex, which the witness stated is obtained by "uniting two materials to form a third substance which has properties that either of the original did not have," such as the germicide called Isodine, which is a

combination of polyvinyl pyrrolidone and iodine (R. 45–46). In tabletting, PVP will give, in certain instances, a more predictable rate of release than other more commonly used granulating agents to obtain the maximum therapeutic effect of the medicant contained in the tablet (R. 47–48). Dr. Kanig concluded his direct testimony by stating that the "technical" grade of polyvinyl pyrrolidone is not used for purposes for which the pharmaceutical grade is employed, because it lacks the same predictability of performance, not having the same narrow specifications of identity in performance, physical or chemical properties, and might contain impurities.

On cross-examination, Dr. Kanig testified that the pharmaceutical grade of PVP is used as a carrier, or a stabilizer, or for granulating tablets (R. 50). He further testified as follows:

"X Q. Now, have you had any dealings with the medicinal grade PVP?—A. By medicinal, do you mean pharmaceutical?

"X Q. No. I mean medicinal.— A. I've never known it to be called that.

"X Q. Didn't you start your testimony by saying there are three different grades?—A. Yes; technical, pharmaceutical, and a grade which is used for blood plasma substitutes.

"X Q. Wouldn't you call that medicinal?—A. Well, the one that's used for blood plasma substitute I guess you could, but I've never heard it used that way.

"X Q. Now, there's nothing medicinal about the pharmaceutical grade, is there?—A. I'm afraid you have to define what you mean by medicinal.

"X Q. Therapeutic; curing.

\* \* \* \* \* \*

"X Q. Did you ever hear of, or do you know of PVP, the pharmaceutical grade, being prescribed as a medicine for preventing or curing of any disease?—A. By itself?

"X Q. By itself.—A. Only where it's used as a blood plasma substitute.

"X Q. Only where it's used as a blood plasma substitute. And the pharmaceutical grade cannot be used as a blood plasma substitute, can it? —A. No." [R. 53–55.]

Percy O. Cunningham, examiner at the port of New York, who advisorily classified the importations at bar, was also called as a witness by the plaintiff. He stated that most of the notices, heretofore referred to in plaintiff's collective exhibits 1 and 2, were sent by him personally or under his direction. The witness further testified that his advisory classification of PVP during the period 1953 to 1956 was in accordance with written instructions from the Bureau of Customs, as outlined in plaintiff's exhibit 5. The latter consists of a letter, dated July 26, 1951, from the Bureau to the United States Tariff Commission, stating, in part, as follows:

"\* \* \* Field reports received in the Bureau disclose that there has not been a uniform practice of classifying polyvinyl pyrrolidone, and various sources have been contacted in connection with your inquiry. In substance, these reports disclose that polyvinyl pyrrolidone has been imported in three forms: (a) bottles of a $3\frac{1}{2}$ percent Kollidone K–30 pharmaceutical grade, (b) a 20 percent solution of the same product, and (c) the same product in powder form. Product (a) contained salts to establish isotonicity with blood, but products (b) and (c) did not. The therapeutic properties of the polyvinyl pyrrolidone were the same in all three products, and each product was of the requisite range of molecular weights for direct administration. It has been used for therapeutic purposes as a blood plasma extender or substitute, and other therapeutic possibilities are being explored. Research in the uses of polyvinyl pyrrolidone in the industrial fields is also being conducted.

"Polyvinyl pyrrolidone is a nitrogenous compound of vinyl alcohol polymerized and therefore within the purview of paragraph 2, Tariff Act of 1930. It is also provided for with equal specificity in paragraph 5 of the tariff act as a medicinal preparation.

"Since the provision for medicinal preparations in paragraph 5 is a provision by use, the Bureau is of the opinion that polyvinyl pyrrolidone of pharmaceutical grades is properly classifiable thereunder at the rate of 12½ percent ad valorem. Polyvinyl pyrrolidone of non-pharmaceutical grades is classifiable as nitrogenous compounds of vinyl alcohol polymerized, under paragraph 2, Tariff Act of 1930, as modified, with duty at the rate of 3 cents per pound and 15 percent ad valorem."

Mr. Cunningham testified, in this connection, that pursuant to the aforesaid instructions, the initial shipments of PVP by the importer herein were advisorily classified by him as medicinal preparations, dutiable under paragraph 5 of the tariff act, as amended, at 12½ per centum ad valorem. With respect to the imported merchandise, it appears from the record that the change from the latter classification and rate of duty to that under paragraph 2 of the tariff act, at the rate of 3 cents per pound and 15 per centum ad valorem, as a nitrogenous compound of vinyl alcohol was based upon certain standards or specifications set by the General Services Administration for blood plasma grade PVP. Samples of the imported merchandise were submitted to the United States Customs Laboratory, from which were received certain reports relative to the nature of the merchandise (defendant's exhibits A, B, C, and D). Nothing in any of these reports shows the specifications followed, the tests made, or how the conclusions set forth were reached. Each report, in substance, states that the sample submitted is polyvinyl pyrrolidone which "does not meet the requirements

for medical grade polyvinyl pyrrolidone as set forth in G.S.A. specifications for polyvinyl pyrrolidone injection (21 Feb. 1955)."

Plaintiff's last witness was Dr. Hans M. Wolz, a chemist associated as technical adviser with BASF, Inc., New York, representative of Badische, Anilin & Loda Fabrik of New York. The shipper of the merchandise here involved was the parent company of the latter concern, located in Ludwigshafen A. Rhein, Germany. The witness stated that he had seen PVP produced and that he is familiar with three grades or classes of such product, a technical grade, a pharmaceutical grade, and a blood plasma substitute grade, the differences in the three types being primarily one of purity and also a difference in molecular weight (R. 73–75). Dr. Wolz testified that only the pharmaceutical grade was sold to Biddle Sawyer Corp.

The first question for determination is whether or not the facts here set forth are sufficient to warrant a conclusion of law that there existed an established and uniform practice in the classification of PVP pharmaceutical grade, which could not be changed, without giving the notices provided for in section 315(d) of the Tariff Act of 1930, as amended, supra, and in section 16.10 (a) of the Customs Regulations of 1954, supra. It is not controverted that the Customs Bureau has never changed the instructions, heretofore referred to in its letter of July 26, 1951 (plaintiff's exhibit 5).

Counsel for the plaintiff, in his brief, directs our attention to the holding of the court in United States v. Fred Whitaker Company, Inc., 40 C.C.P.A. (Customs) 19, C.A.D. 492. The merchandise there involved consisted of certain bales of raw wool commonly designated as "wool in the grease" or "greasy wool." The question presented was what constituted "clean content" of the imported wool, in a tariff sense. It appeared that, in arriving at the percentage of net weight of the clean content of the merchandise, the collector included as part

of the clean content a certain percentage of loose fibers washed from the wool which, it was contended by the importer, was not part of the clean content and "not wool," either in a commercial or tariff sense. In its decision, the court, in the Whitaker case, supra, 40 CCPA page 28, stated:

"There can be no question that from the effective date of the Tariff Act of 1922 until the year 1941, the Government consistently recognized that the term 'clear [sic] content' meant the commercial yield of clean wool and during that period duty was assessed upon such estimated yield which did not, of course, include the unrecoverable and unavoidable loss incident to all of the cleansing processes. Neither can there be any doubt but that the 'visual method' of estimating clean content, by which price is fixed, is still the usual method in buying and selling raw wool."

The above procedure was departed from in determining what constituted clean content of the wool involved in the Whitaker case.

Concerning the applicability of the rule of long administrative practice, the court said, 40 CCPA page 29:

"Of course, long administrative practice, such as present here, is not conclusive upon the court, but, in our opinion, it should carry considerable weight, at least sufficient to dissipate any doubt we might have concerning the approval by Congress of such practice as is shown by the use of the term "clean content" in the Act of 1930, as it appeared in the Act of 1922.

"Nowhere in the record does it appear that the change in practice such as was made here in the testing of the wool, was due to any Regulation of the Treasury Department and if, as is argued by counsel for appellee in his brief, such change of practice could be considered as due to an order of the Treasury Department, no such notice of such change was ever published in the Treasury Decisions as the law directs. If, of course, it was not made pursuant to a Treasury ruling, such assessment was illegal in that it violated Sec. 315 of the Act of 1930, as amended by the Administrative Act of 1938, * * *."

The court, in the Whitaker case, supra, held that the term "clean content," as it appeared in the predecessor Tariff Act of 1922, was understood by the industry and the Treasury Department to mean the commercial yield of clean wool which did not include the unrecoverable and unavoidable loss incident to the cleaning processes and that Congress approved such understanding by continuing the use of that term in the involved act.

A study of the Fred Whitaker case, supra, shows that the decision there was not based upon the fact that the court found there was long administrative practice in support of the position taken by the importer, but rather upon the ground that a consideration of the administrative practice followed aided the court in determining the legislative intent of Congress in using the phrase "clean content" in the Tariff Act of 1930 in the same manner in which it was used in the act of 1922. The court pointed out that "long administrative practice" is not conclusive upon the court.

In the case of Rapken & Co., Ltd. v. United States, 25 CCPA (Customs) 268, T.D. 49393, the court, in commenting on the consideration the court should give on the question of long administrative practice, stated, page 273:

"* * * However, long-continued administrative practice may aid in the interpretation of tariff statutes, but it does not preclude the courts from construing or interpreting a statute contrary to such practice when an issue as to its interpretation is presented for the first time.

"In numerous decisions of the Supreme Court of the United States, the rule has been laid down that for administrative practice to be even

persuasive in a case, it must be proved to have been known, long continued, uniform and general. The Dollar Savings Bank v. United States [19 Wall. 227], 86 U.S. 227 [22 L.Ed. 80]; Merritt v. Cameron, 137 U.S. 542 [11 S.Ct. 174, 34 L.Ed. 772]; United States et al. v. Missouri Pacific Railroad Co., 278 U.S. 269 [49 S.Ct. 133, 73 L.Ed. 322]."

In the case of Bloomingdale Bros. et al. v. United States, 3 Ct.Cust.App. 204, T.D. 32530, the court held, page 205:

" * * * Departmental practices and usages, however uniform and long continued they may be, are nothing more than aids to the court in construing a law of doubtful import, and in no case can they be invoked to defeat the legislative will expressed in clear, unambiguous, and unequivocal terms."

It should be pointed out that, in section 315(d) of the Tariff Act of 1930 and in section 16.10(a) of Customs Regulations, 1954, the phrase "long-established administrative practice" does not appear. The wording is "an established and uniform practice." However, that which is established cannot be something of a temporary or doubtful nature. It must, according to the dictionary definition, be appointed, enacted, or ordained from permanence and, as such, entitled to full recognition or acceptance. There would appear, therefore, to be little difference between a long-established administrative practice and an established and uniform practice. In a situation, such as that here under consideration, it would seem that the honoring of a practice by the passage of time is essential to its acceptance as established.

In the case of Pittsburgh Plate Glass Co. v. United States, 2 Ct.Cust.App. 389, T.D. 32162, it was contended by the importer, page 391—

" * * * that the long-established customs usage, dating from 1903 until the origin of this controversy in 1910, whereby this merchandise was, during said period, assessed as

herein claimed by the importer, should control. We do not think this is a case where the principle of long-established customs usage is determinative. The application of that principle of judicial interpretation confines its exercise to cases wherein there is a doubtful meaning of a statute. In such cases of doubt long-established customs usage may be invoked as determinative of one contention or the other. * * * "

What constitutes an established and uniform practice is rather hard to determine. In the cases examined by the court, most do not attempt to set up any definite standards for the determination of this question. In the Rapken case, supra, the Supreme Court of the United States is quoted as authority for the legal conclusion that "administrative practice to be even persuasive in a case, it must be proved to have been known, long continued, uniform and general."

In the instant case, the testimony of Examiner Cunningham indicates that, from 1951 to 1957, pharmaceutical grade polyvinyl pyrrolidone was uniformly classified at the various ports under paragraph 5 as a medicinal preparation, and, at the time of the trial, there was nothing to indicate that this uniform practice had been broken by any port, except at New York.

In the light of all the facts in this case, it is doubtful that an established and uniform practice, as defined by the courts, has been shown. In any event, the evidence is not sufficient to warrant the court in deciding this case upon the basis of such contention. The provision for "medicinal preparations" in paragraph 5 of the tariff act embraces only those substances having therapeutic properties and which are used in the cure and treatment of bodily disorders. United States v. Wm. Cooper & Nephews, Inc., 22 CCPA (Customs) 31, T.D. 47038. The reply of the deputy collector, as indicated in plaintiff's exhibit 4, supra, that polyvinyl pyrrolidone of pharmaceutical grade "is dutiable at 12½% ad valorem under paragraph 5,"

in response to an inquiry made by the importer, could only refer, in our opinion, to such grade as was embraced within the "medicinal preparations" provision of the act, as defined by our courts. The information so given is not conclusive as to whether or not the merchandise here imported is properly classifiable under the medicinal preparations provision of the tariff act. Further, the information contained in the Bureau of Customs letter, dated July 26, 1951, relative to polyvinyl pyrrolidone appears to indicate "that there has not been a uniform practice of classifying polyvinyl pyrrolidone" (plaintiff's exhibit 5). The most that can be said of the evidence on the point of establishing uniform practice is that it might be of aid to the court in determining the legislative intent in the present case. However, even upon that point, there does not exist sufficient unambiguity in the statutes involved to justify the court in giving much reliance to the question of an established and uniform practice in arriving at the legislative intent.

 We are, therefore, under the necessity of deciding this case upon the merits of the question as to whether or not, under the evidence herein presented, the imported merchandise was, in fact, a medicinal preparation, properly classifiable under paragraph 5. To begin with, the issue must be more clearly pinpointed. If the evidence showed, which it does not, that the PVP in question was intended, as imported, for direct administration by itself for the treatment of human ailments, then clearly it would be a medicinal. However, in this case, the evidence shows that the substance was not intended for direct administration to patients, in its imported condition; it was intended for use, and used, in the manufacture of tablets that were designed for use in treating human beings. When the imported PVP was used in the making of tablets, it served as a carrier and stabilizer. There is no evidence showing that it added any therapeutic qualities to the tablets. The exact question presented, therefore, is whether an

imported product intended for use not by itself, but in the manufacture of medicinal tablets, could, for tariff classification purposes, be considered a medicinal.

There have been many cases decided by the Customs Court and the court of appeals on the question of what constitutes a medicinal preparation. In the case of Synthetic Patents Co., Inc. v. United States, 11 Cust.Ct. 98, C.D. 803, at page 102, the court held as follows:

"In a line of decisions (Battle & Co. Chemists' Corp. v. United States, [D.C.], 108 Fed. 216; McKesson & Robbins v. United States, 3 Ct.Cust. Appls. 515, T.D. 33167; and William Cooper & Nephews, Inc. v. United States, 10 Cust.Ct. 247, C.D. 763) the courts have held imported merchandise properly classifiable as medicinal preparations where it was shown that the product in question required no chemical change or compounding with other medical ingredients, from its imported condition, for its medicinal use. That the merchandise was diluted or mixed with some inert carrier when administered, did not affect its tariff classification as a medicinal preparation. * * * "

In the above connection, see also the holding in the case of United States v. Wm. Cooper & Nephews, Inc., supra.

In the present case, the evidence does not indicate that the imported PVP which was used for the making of tablets contained the therapeutic ingredients which gave the tablets their curative properties. It evidently was only an inert carrier or stabilizer (R. 50). The strongest testimony in favor of the plaintiff's contention for classification under paragraph 5 is found in the evidence given by Dr. Joseph L. Kanig. He testified, however, that he had never heard of the pharmaceutical grade PVP being prescribed by itself as a medicine for preventing or curing of any disease (R. 54).

There is nothing in the testimony herein to indicate that the pharmaceutical grade PVP, in the instant case, was the

medicant involved in giving the assembled or completed tablet its potential therapeutic effect. On the other hand, the conclusion is unescapable that the real materials of therapeutic value were contained in ingredients other than the PVP and that the use of the latter, at most, was as a carrier to control the point of release of the therapeutic ingredients in the tablets and, further, to control the rate of their release. Under the facts in this case, the PVP was not really shown to be a medicinal preparation.

In the case of United States v. Alltransport, Inc., 44 CCPA (Customs) 149, C.A.D. 653, certain absorbable gelatin sponges used in surgery were held to be classifiable as medicinal preparations under paragraph 5 of the Tariff Act of 1930, rather than as manufactures of gelatin under paragraph 41 of the said act. It appeared that they were used directly and by themselves as imported. After citing numerous authorities on the uses of gelatin, the court, in the Alltransport case, supra, 44 CCPA page 153, stated:

> "It therefore appears that gelatin *per se* has hemostatic properties and that hemostatic action may be mechanical or chemical or both."

The court, accordingly, reached the conclusion that the merchandise there involved had a chemical interaction on or with the blood which, with respect to the human body, was therapeutic or medicinal in nature and that it was used "in curing or alleviating, or palliating or preventing some disease or affection of the human frame." As appears from the record therein, the Alltransport case, supra, is clearly distinguishable from the situation now before us.

We are of the opinion and hold that the plaintiff has not established that the polyvinyl pyrrolidone now under consideration is properly classifiable as a medicinal preparation under paragraph 5 of the Tariff Act of 1930, or that it should be given any classification other than that to which it was assigned by the collector. Specifically, we hold that the im-

ported merchandise is properly classifiable under paragraph 2 of said tariff act, as modified, as a nitrogenous compound of vinyl alcohol at the rate of 3 cents per pound, plus 15 per centum ad valorem, as assessed.

The protest is, therefore, overruled and judgment will be entered accordingly.